UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

United States of America,

v.

Daniel B. Kamensky,

Defendant.

Case No. 21-cr-00067 (DLC)

---

### SENTENCING SUBMISSION OF DEFENDANT DANIEL B. KAMENSKY

Joon H. Kim
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York  10006
jkim@cgsh.com
212-225-2000

Lawrence Gerschwer
BARNES & THORNBURG LLP
445 Park Avenue
Suite 700
New York, New York 10022
lawrence.gerschwer@btlaw.com
(646) 746-2022

*Attorneys for Daniel B. Kamensky*

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..................................................................................................ii

I.   Introduction................................................................................................................1

II.  Personal Background .................................................................................................2

    a.   Dan's Early Life ................................................................................................2

    b.   Dan's Professional Life ....................................................................................3

    c.   Dan's Family Life..............................................................................................8

    d.   Dan's Service and Contributions to the Community......................................11

    e.   ██████████████████████ ..........................................................15

III. The Offense Conduct and Its Aftermath.................................................................17

IV.  A Non-Custodial Sentence Involving a Term of Probation and Community
    Service Serves The Purposes of Section 3553(a) ....................................................25

        A.   Applicable Sentencing Guidelines Range ....................................................25

        B.   The Application of Section 3553(a) Sentencing Factors Weigh In
            Favor of A Sentence of Term of Probation and Community Service......................26

    a.   The Nature and Circumstances of the Offense ..............................................26

    b.   History and Characteristics of the Defendant................................................30

    c.   Sentencing of Similarly Situated Defendants ................................................35

    d.   General and Specific Deterrence ....................................................................39

    e.   COVID-19 Pandemic Weighs Against Custodial Sentence ...........................42

V.   Conclusion...............................................................................................................44

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Citicorp Venture Cap., Ltd. v. Comm. Of Creditors Holding Unsecured Claims*,
160 F.3d 982 (3d Cir. 1998)..................................................................................... 39

*Gall v. United States*,
552 U.S. 38 (2007).................................................................................................... 25

*In re 160 Royal Palm, LLC*,
600 B.R. 119 (S.D. Fla. 2019) .................................................................................. 28

*In re Allegheny Int'l, Inc.*,
118 B.R. 282 (Bankr. W.D. Pa. 1990) ...................................................................... 39

*In re Fam. Christian, LLC*,
533 B.R. 600 (Bankr. W.D. Mich. 2015)............................................................... 27-28

*In re Mountain States Rosen, LLC*,
619 B.R. 750 (Bankr. D. Wy. 2020) ......................................................................... 27

*In re Rickel & Assocs., Inc.*,
272 B.R. 74 (Bankr. S.D.N.Y. 2002)......................................................................... 27

*In re Signature Apparel Grp. LLC*,
577 B.R. 54 (Bankr. S.D.N.Y. 2017)......................................................................... 39

*U.S. v. Booker*,
543 U.S. 220 (2005).................................................................................................. 35

*United States v. Campagna*,
No. 16-CR-00078 (LGS), 2020 WL 1489829 (S.D.N.Y Mar. 27, 2020) ......................... 43

*United States v. Jones*,
460 F.3d 191 (2d Cir. 2006)...................................................................................... 25

*United States v. Peel*,
595 F.3d 763 (7th Cir. 2010) .................................................................................... 36

*United Steelworkers of Am. v. Lampl (In re Mesta Mach. Co.)*,
67 B.R. 151 (Bankr. W.D. Pa. 1986) ........................................................................ 39

**Rules and Statutes**

11 U.S.C. § 105(a) ................................................................. 38

11 U.S.C. § 363(n) ................................................................. 38

11 U.S.C. § 510(c) ................................................................. 38

11 U.S.C. § 1104 ................................................................... 38

11 U.S.C. § 1126(e) ............................................................... 38

18 U.S.C. § 3553(a) ............................................................ 2, 26

18 U.S.C. § 3553(a)(6) ............................................................ 35

18 U.S.C. § 152(6) ........................................................... *passim*

**Other Authorities**

Dep't of Justice, Office of Att'y Gen., Memorandum from Attorney General William
Barr to BOP Director Michael Carvajal (Mar. 26, 2020),
https://www.justice.gov/file/1262731/download ................................. 43

Stuart A. Kinner & Jesse T. Young et al., *Prisons and Custodial Settings Are Part of a
Comprehensive Response to COVID*-19, 5 The Lancet e188 (Mar. 17, 2020) ................. 42

## Dan Kamensky Sentencing Submission

### I.   Introduction

We respectfully submit this memorandum on behalf of Daniel B. Kamensky in advance of his sentencing, currently scheduled for May 7, 2021.  The wrongful conduct that brings Dan before this Court occurred over a few hours on one day, July 31, 2020.  As he acknowledged almost immediately afterwards and consistently ever since, Dan made terrible mistakes that day. He deeply regrets these mistakes, and he remains haunted by the impact it has had on those closest to him—his family and friends, as well as his clients and colleagues at Marble Ridge Capital.  What Dan did on July 31—calling Jefferies and telling them not to bid on assets that were subject to a settlement in the Neiman Marcus bankruptcy—was wrong.  In doing so, he breached his fiduciary duty as a member of the unsecured creditors' committee in the Neiman Marcus bankruptcy.  And for that, Dan now stands a convicted felon.

Although Dan's conduct was wrong, it happened almost instantaneously and did not involve any premeditation or planning.  He reacted in moments of intense stress and pressure in a way that he should not have.  Importantly, his conduct did not cause any economic harm to the unsecured creditors.  Jefferies put in their bid shortly afterwards, and the unsecured creditors' recovery (only possible in the first place through Dan's multi-year-long efforts to preserve and pursue fraudulent conveyance claims against Neiman Marcus's sponsors) was unaffected.  Dan's inappropriate conduct that day was a momentary lapse that does not reflect who Dan is and how he has lived his life.  As reflected in more than one hundred letters submitted by family, friends, colleagues, business associates, and even competitors, Dan has lived his life with honesty, integrity, generosity, and kindness in ways he never intended to be publicized.  That was true before July 31 and it has been true since.  Despite the devastating impact on him personally and professionally, Dan has taken responsibility for and sought to make amends for his actions over

those few hours.  He promptly withdrew from the unsecured creditors' committee, cooperated fully with the U.S. Trustee's investigation, subordinated all of his personal interests in the Neiman Marcus bankruptcy, and made the heart-wrenching decision to close the fund he founded, Marble Ridge Capital.  After he was arrested at his home, Dan waived indictment and pled guilty to an information charging him with felony bankruptcy fraud.  Consistent with the upstanding way he has led his life, Dan has not run away from his conduct that day; he has faced and quickly accepted its consequences and sought to help others learn from his mistakes.  And he now comes before this Court prepared to accept its judgment.

For the reasons set forth in greater detail below—and based on the Section 3553(a) sentencing factors, including the nature and circumstances of the offense, Dan's history and characteristics, treatment of similar conduct, and the lack of need for general or specific deterrence here—we respectfully submit that a noncustodial sentence of probation, with mandatory community service, is "sufficient but not greater than necessary" to achieve the goals of sentencing.  18 U.S.C. § 3553(a).

## II.  Personal Background

### a.  Dan's Early Life

Dan was born on December 23, 1972 in Illinois as a ray of hope for a still-grieving family.  The second oldest of his three older brothers, Michael, had drowned in a swimming pool accident just eighteen months earlier.  *Ex. 2 (Judy and Marvin Kamensky Ltr.)* at 1.  For his parents, Dan filled a void in their hearts that they did not think would be possible to fill.  *Id.* Knowing this history, Dan never took his life for granted, seizing all the opportunities given to him with energy, commitment, and passion.  *Ex. 1 (Amy Blumenfeld Kamensky Ltr.)* at 3.  Seeing his promising potential at an early age, his parents sought to provide Dan with extra educational

2

opportunities, and Dan worked hard, motivated not only by his parents' encouragement, but also his desire to pay tribute to his brother Michael. *Id.*

Even as a young child, Dan had an open, welcoming, and generous nature. *See, e.g., Ex. 23 (Michelle Klein Ltr.)* at 1 ("Danny was the type of child who made everyone in class feel included, and that generosity of spirit remains to this day."); *Ex. 11 (Rebolledo Ltr.)* at 1 ("As a child, Dan already had a big heart. He always made friends feel welcome in his home, he was fun, he was kind, and he was accomplished."); *Ex. 12 (Debra Zide Ltr.)* at 1 (marveling at his "pure joy about life at such a young age" and his ability to "li[ght] up the room with his storytelling abilities and aura"); *Ex. 22 (Jeff Srulovitz Ltr.)* at 1 (from an early age, "Dan was always a north star for our group of friends"). Dan's friends from high school, many of whom remain friends with him today, similarly recall someone with unusual compassion and empathy. *Ex. 19 (Peressutti Ltr.)* at 1 ("And to know Dan is to know that his unique combination of passion, humor and empathy were what made him one of the more popular and respected students in high school."); *Ex. 18 (Tracy Ltr.)* at 1 (describing how Dan helped mend a falling out by "fully supporting both sides and playing the role of peacemaker"); *Ex. 13 (A.J. Levin Ltr.)* at 1 (appreciating Dan for being "a great listener" throughout their 34-year friendship, "asking you questions, probing, and really trying to have a good understanding of what you're saying").

### b.  Dan's Professional Life

As he grew as a young man preparing for his professional life, graduating from Georgetown University in 1995 and earning his law degree from Georgetown University Law Center in 1998, Dan still exhibited that same empathy and compassion he displayed earlier in his life. *Ex. 94 (Wasylik Ltr.)* at 1 (recalling how Dan arranged for childcare for the young daughter of a visiting professor for a symposium he was organizing at the law school). He began his

professional career as a law clerk for Judge Susan H. Black on the Eleventh Circuit. Following

the clerkship in 2000, Dan joined the law firm of Simpson Thacher & Bartlett LLP as an

associate. In 2005, he left the practice of law to work as an investment professional at Lehman

Brothers, and then in 2009, moved to Paulson & Co. Having developed an expertise in

distressed debt investing and motivated by his father's example of running his own law practice,

in 2015, Dan started his own fund, Marble Ridge Capital ("Marble Ridge"). *Ex. 1 (Amy*

*Blumenfeld Kamensky Ltr.) at* 3-4.

Marble Ridge enjoyed immediate success, and although he intended to maintain it as a

small boutique, Marble Ridge grew quickly both in terms of employees and assets under

management. *Id.* at 4. As Marble Ridge grew, Dan worked hard to maintain a close-knit,

familial, and informal culture. *Ex. 5 (Matthew Kamensky Ltr.) at* 2 ("I think he had about 20

people working for him at the time [I visited Dan's office] and as he took us on a tour, you

would never know that his employees 'worked for' Dan."). He made sure to treat everyone—

from investment professionals to administrative staff—with respect, kindness, and

understanding. *Ex. 98 (Fenton Ltr.) at 3* ("I believe Dan's commitment to the culture of Marble

Ridge and to the well-being of his employees is deeply sincere, as demonstrated by his actions

and employee feedback over the course of four years."); *Ex. 73 (Caiazzo Ltr.)* at 1 ("Dan came

into the office each day with a good morning and a smile on his face, consistently asking about

my family, telling me about his."). He led by example, emphasizing the importance of integrity

and honesty. *Ex. 26 (Schembri Ltr.)* ("[Dan] helped to create and cultivate a strong culture of

respect, open dialogue, continuous learning, and teamwork"); *Ex. 70 (Schlesinger Ltr.)* (citing an

example where Dan shared feedback for improvement he had received with the whole team

noting that,"[t]his experience truly shows Dan's dedication to leading by example through

4

continuous and collaborative self-improvement."). He instilled in his employees the value of giving back to the community, leading the firm in donating holiday gifts to children in need and in taking days off to help build homes with Habitat for Humanity as a team. *Ex. 1 (Amy Blumenfeld Kamensky Ltr.)* at 4. He genuinely cared about and invested in the personal and professional development and well-being of his employees, helping one employee's brother find work, paying for another's speech therapy for six months to help that colleague overcome a speech impediment, and encouraging another to take time away from work to be with his ailing father. *Id.* at 4; *Ex. 72 (Falcone Ltr.)* at 2.

Dan's treatment of others stood out in what was otherwise a highly competitive and sharp-elbowed industry. A former colleague at Paulson & Co. wrote that "[m]any successful hedge fund executives don't treat others very well. From my firsthand experience, Dan was the exception." *Ex. 69 (Steiner Ltr.)* at 1. One Marble Ridge employee remarked that Dan was "honest, hardworking and caring. . . he fostered a team and family environment and genuinely cared about the employees who worked for him." *Ex. 71 (Pearson Ltr.)* at 1; *Ex. 70 (Schlesinger Ltr.)* at 2 ("Dan is the type of leader and role model that any person dreams of having."). Nicole Caiazzo, Dan's former executive assistant, remembered her time at Marble Ridge fondly, saying, "I truly looked forward to work each day because of the positive environment he created there." *Ex. 73 (Caiazzo Ltr.)* at 1. Dan's commitment led an executive consultant to comment on Marble Ridge's positive culture and employee engagement, stating that "in my decades of experience, Dan definitely stands out in his thoroughness and thoughtfulness, particularly in this industry, with respect to company culture and team development." *Ex. 98 (Fenton Ltr.) at 3.* Ms. Caiazzo pays Dan the ultimate compliment, stating that she is "currently 20 weeks pregnant with [her] first son" and she "truly hope[s] to raise him to be a man like Dan Kamensky. A family

man, a great friend to have, someone who always puts others before himself, and the best leader a team could ask for." *Ex. 73 (Caiazzo Ltr.)* at 2.

In the rough and tumble world of distressed debt investing, where parties with disparate and conflicting interests work and compete within a complex bankruptcy system, Dan stood out for his ethics, integrity, perspective, and fairness, as well as his willingness to collaborate, cooperate with and even support others. His former supervisor at Lehman Brothers commented that "[e]ven in the most contentious of situations (distressed investing can often devolve into a zero-sum battle), his legal, professional and personal ethics were never called into question." *Ex. 48 (Seery Ltr.)* at 1. Dan developed a reputation as "an advocate for compromise and creative resolution of complex bankruptcy disputes" who recognized that "all parties need to come away with something of value." *Ex. 42 (Pauker Ltr.)* at 2. Raj Iyer, a partner and senior portfolio manager at a large asset management firm, commented that in "an industry characterized by strong rivalry, I found Dan to be a collaborative problem solver. . . . [I] really enjoyed working with Dan who was creative, kind and engaging of the opinions of others." *Ex. 54 (Iyer Ltr.)* at 1. Jed Nussbaum—who wrote that he and Dan "should have been rivals, running funds with similar strategies and competing for capital" at a time when multiple distressed debt funds were launching—remarked that instead they became friends and supporters. *Ex. 47 (Nussbaum Ltr.)* at 1; *Ex. 58 (Blumgart & Benaim Ltr.)* at 2 ("Never one to bad-mouth his peers, we were often taken aback by how nicely he spoke about his rivals."); *Ex. 52 (Barr Ltr.)* at 1 (noting that "he was genuinely rooting for our success, a sign of a true friend.").

Others who knew and have worked with—and even against—Dan professionally note his integrity and fairness. Marc Kirschner, a bankruptcy attorney who first met Dan while serving as the Chapter 11 Trustee for Refco Capital Markets, recalled that analysts and traders would

6

frequently call him to discuss complex issues surrounding the Refco bankruptcy.  While many "tried to overstep their bounds," Dan, then a distressed debt analyst at Lehman, "was more respectful of [Mr. Kirschner's] fiduciary duties and [his] obligations not to disclose material non-public information."  *Ex. 51 (Kirschner Ltr.)* at 1.  A former colleague at Paulson, Sam Molinaro, recalled that following his appointment to the board of a distressed company, "there was never an instance where Dan attempted to exert any influence over me.  He respected my independence at all times and never once asked for me to influence a decision or outcome."  *Ex. 76 (Molinaro Ltr.)* at 1.  Former investment firm partner Evan Lederman, who has worked with Dan extensively, "sometimes on the same side and sometimes against him," likewise praised his "honesty, integrity, and reasonableness."  *Ex. 44 (Lederman Ltr.)* at 2.

Dan also displayed his fairness and integrity in the meaningful work he has done to improve the bankruptcy process.  Rich Levin, a respected bankruptcy attorney who has held leadership positions with the National Bankruptcy Conference and the American College of Bankruptcy, who has interacted with Dan both professionally and socially, remarked on Dan's independent judgment while collaborating on the American Bankruptcy Institute's project to propose modernizations to Chapter 11, explaining that "Dan always worked to develop the best policy solutions, independent of his firms' financial interests."  *Ex. 55 (Rich Levin Ltr.)* at 1. Dan was also instrumental in developing policies with the Loan Syndication Trading Association ("LSTA"), a self-regulatory financial trade association focused on all aspects of the $1.3 trillion syndicated corporate loan market.  *Ex. 43 (Ganz Ltr.)* at 1.  LSTA General Counsel Elliot Ganz recalled, as one example of many, how Dan worked intensely with the LSTA to devise a fairer disclosure rule in Bankruptcy cases that was ultimately approved by the United States Supreme Court to avoid the "weaponizing" of the disclosure requirement.  *Id.*  Citing Dan's work with the

LSTA, Howard Shams, an investment firm CEO and longtime professional contact, applauded Dan's "commit[ment] to building properly functioning fair market practices." *Ex. 46 (Shams Ltr.)* at 2.  Concerning the events of July 31, he remarked, "[t]hat is what makes this error such an outlier; Dan was the guy who helped codify fair practices." *Id.*

Colleagues and investors also admired Dan's professionalism and work ethic, describing him as "one of the hardest workers in the distressed debt department" at Lehman, *Ex. 75 (Feinstein Ltr.)* at 1, and "a passionate, intelligent and driven investment professional," *Ex. 40 (Herz Ltr.)* at 2.  One of Dan's first investors explained that he "knew with [Dan's] work ethic, [Dan] would be more than likely to be successful." *Ex. 18 (Tracy Ltr.)* at 2.  Another early investor wrote that he has "remained invested with [Dan] to this day, never having taken a distribution" because of his "total faith in Dan as a true professional—smart, honest and hard working." *Ex. 76 (Molinaro Ltr.)* at 2.

### c.  Dan's Family Life

Dan's family—in particular his wife Amy and his daughter Mia—are at the heart of everything that he does and the person that he is.  Dan met Amy in March of 2000, just as he began his professional career in New York.  He learned, during an early date with Amy, that because of treatment she had received as a child for Hodgkin's lymphoma, she might never be able to have children.  Dan responded with "a broad smile" and the words "so, we'll adopt."  As Amy put it, she "knew then he was a keeper." *Ex. 1 (Amy Blumenfeld Kamensky Ltr.)* at 2.  Amy indeed kept Dan, and they married in 2002.  In 2006, Amy and Dan had their "miracle child" and "greatest gift," their daughter, Mia. *Id.*

Dan, Amy, and Mia form an extremely close-knit nuclear family.  They are deeply devoted and committed to each other—cheering each other's successes and supporting each

other through struggles.  Amy fully backed Dan as he pursued his dream of creating and running

his own business—██████████████████████████████████—

and she has served as a rock through the strains that the criminal conviction has placed on Dan

and the family.  Even before July 31, 2020, life has not always been easy for the family.  In

2013, Amy was diagnosed with breast cancer and had to undergo a bilateral mastectomy.  In

2015, Amy endured a hysterectomy and multiple treatments for pre-cancerous lesions.  *Id.* at 2-3.

For his part, Dan tended to Amy's every need through her illnesses—cleaning and changing her

bandages, emptying the drains, creating a chart to monitor the fluid in the tubes, and sleeping

every night on a recliner chair so that she would not be alone.  *Id.* at 3.  Their special relationship

reveals much about both of their strength and integrity.

To his daughter Mia, Dan has always been the most loving and doting father.  Amy

describes him as "[Mia's] math and Spanish homework helper.  Her bike ride companion.  Her

exercise buddy."  She notes that Dan "has attended every school play, graduation ceremony,

dance recital and art exhibition, and he has always kept a small standing easel with art supplies in

the corner of his office for when she visits.  No matter where he is or what he is doing, he will

drop everything and do anything for her."  *Id.*  A colleague from Paulson recalled that "if you

needed to speak with Dan you had better do it by 5pm because he would leave the office at that

hour so that he could be at home to eat dinner with his family."  *Ex. 69 (Steiner Ltr.)* at 1.

Everyone who knows Dan knows him as "an extremely proud father," *Ex. 93 (Hon. Arthur*

*Gonzalez Ltr.)* at 2, and remarks that "[w]atching Dan with his daughter is an absolute pleasure.

He has helped to make a warm and loving home.  Dan is a beaming and proud father."  *Ex. 15*

*(Lieberman Ltr.)* at 2.

Dan also remains close to his parents, Judy and Marvin Kamensky.  To them, Dan was "a perfect child [who for] 48 years has consistently brought [them] tremendous pride—not only by his accomplishments but by his golden heart."  *Ex. 2 (Judy and Marvin Kamensky Ltr*) at 4.  Dan was the first to notice his father's trembling hand a decade ago and has been helping him deal with Parkinson's disease ever since.  He recently flew to his parents' home in Florida "on a minute's notice" to help care for his father and to get him a walker and wheelchair following a fall.  *Ex. 86 (Castellano Ltr.)* at 2, *Ex. 10 (Jerrold Kamensky Ltr.)* at 2.  Dan also remains close to his older brothers, both of whom describe a younger brother who they not only love, but respect for his character and values.  *Ex. 4 (Todd Kamensky Ltr.)* at 2 ("Dan is, and will always be, one of [his] (super)heroes."); *Ex. 3 (Rob Kamensky Ltr.)* at 2 ("Dan has always had a firm sense of right and wrong"; "Dan is an inspiration").  Dan enjoys strong relationships with his entire extended family, including uncles, cousins, nieces, nephews and in-laws, often being the one to ensure at gatherings that everyone, adults and children, feels the love and closeness of family.  *See, e.g., Ex. 8 (Deborah Kamensky Ltr.)* at 1 ("Dan treasured his relationships with cousins during his childhood, and therefore has made huge efforts to make sure his daughter, Mia, has that same close relationship with her cousins."); *Ex. 6 (Alexis Kamensky Ltr.)* at 1 (Dan's niece described "watching the television show, 'Succession' with [Dan] on the couch in Florida and having him explain the ins and outs of the world of business deals that took place in the show."); *Ex. 5 (Matthew Kamensky Ltr.)* at 1 ("I have two boys (11 and 13) and Dan has always treated them with a deep sense of love and joy and they in turn love him as their fun and cool cousin.").

Amy's parents and family have also "embraced" Dan as one of their own.  *Ex. 20 (Harry Mamaysky Ltr.)* at 1.  Josh Blumenfeld (Amy's brother) and his wife, Michelle Witman, describe

their relationship with the Kamenskys "not as extended family units but more like one large immediate family." *Ex. 9 (Witman and Blumenfeld Ltr.)* at 1.  One reason Dan has fit in so well with the Blumenfelds is their shared dedication to fairness, justice, and helping others:  Amy's father, a former public defender who lead the Bronx Legal Aid Society and state court judge, and mother, a public school teacher, "have lived modestly in order to help others, devoting their lives to family and community.  Choosing to join this close-knit family is just one of the many ways in which Dan has consistently demonstrated that he shares the same values, prioritizing integrity, generosity, and good works." *Ex. 21 (Kelly Mamaysky Ltr.)* at 2.  As Amy's parents noted "[t]hrough this difficult time for our family, our love for Dan remains as strong as ever . . . he is a wonderful soul . . . All things considered, we couldn't imagine a better son-in-law." *Ex. 7 (Vicki and Joel Blumenfeld Ltr.)* at 9.  As Amy put it most directly, "I would not have dedicated twenty-one years to a man who did not appreciate or share this perspective.  I married a mensch." *Ex. 1 (Amy Blumenfeld Kamensky Ltr.)* at 7.

### d.   Dan's Service and Contributions to the Community

As the many letters submitted to the Court reflect, another core tenet of Dan's life has been a generosity of spirit that puts others before himself and helps those in need.  As Dan's parents expressed it simply, "Danny is a giver, not a taker." *Ex. 2 (Judy and Marvin Kamensky Ltr.)* at 4.  Family, friends and colleagues write of Dan's consistent and long-standing willingness to help whenever he can, in ways big and small.  ███████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████   A friend from high school described that "[n]o matter what Dan was working on or committed to, he was always there to listen, to offer

thoughtful advice, to bring judgment to a situation where there were no simple choices." *Ex. 14 (Marino Ltr.)* at 1. A friend from college vividly recalled how Dan "kept a cold towel around my neck, rubbed my head and did … everything he could to make me realize that it would be ok" while his friend was undergoing chemotherapy treatments a year after graduating from college. *Ex. 32 (Furio Savone Ltr.)* at 2. Another friend described how even in August 2020—as Dan was dealing with one of the most difficult times of his life—he put his own concerns aside to help a friend work through his issues. *Ex. 24 (Belgrod Ltr.)* at 1.

Dan and his family also have devoted their time, energy, and financial resources to communities in need, both near and far. Dan's support of worthy causes and communities in need has not been in flashy or public ways, but rather through genuine, meaningful commitments—"service through deep involvement, investing substantial quantities of his own time and energy." *Ex. 21 (Kelly Mamaysky Ltr.)* at 1; *Ex. 32 (Furio Savone Ltr.)* at 3 ("Over the last two decades I have seen Dan live day in and day out by the mantra of 'doing for others.'"). In his local community in Long Island, Dan actively supported his local synagogue, serving on its board. *Ex. 1 (Amy Blumenfeld Kamensky Ltr.)* at 2. He actively helped a Long Island triathlon fundraiser for children with cancer, called Let Kids Tri. *Ex. 86 (Castellano Ltr.)* at 1. He also took particular interest in his daughter's elementary school, Solomon Schechter School, the only Conservative Jewish day school on Long Island. As a member of the school's board, Dan "often led and galvanized other parents to implement programs and program-revisions that directly impacted both teachers and students." *Ex. 83 (Adam Altman Ltr.)* at 1. One year, he created a teachers' fund that could be used by each Staff member to purchase supplies of their choosing for their classroom. *Id*. In 2019, when Dan learned that the school faced a shortfall of nearly half of its entire annual budget due to declining enrollment, he immediately pledged

whatever was necessary to keep the school running.  He made it a point to make the donation anonymously.  *Ex. 88 (Sokol Ltr.)* at 1 ("Indeed, when Dan did gift the school with what was to my knowledge the largest single gift we had ever received, the gift was made entirely anonymously.  Only the president of the board at the time knew who had made the gift, as this was Dan's express request.").  Few people who make large donations do so with an expectation of receiving no recognition in return.  Yet, that was the express condition of Dan's generosity.  In fact, Dr. Sokol, the school's director, noted that Dan made this donation at a time when Dan's daughter had already decided to attend another school in the area for high school.  *Id.*

For many years, Dan has also generously supported the Jewish National Fund ("JNF") with his time, energy, and resources, taking on leadership positions and leading fundraising efforts.  *See Ex. 87 (Robinson Ltr.)* at 2, *Ex. 45 (Novikoff Ltr.)* at 2.  As JNF Executive Director Michael Feinman stated, "[t]o say that with Dan's help and guidance, Jewish National Fund has been able to connect with and raise money from a community would be an understatement.  He is gracious with his time, his contacts, and his financial resources."  *Ex. 84 (Feinman Ltr.)* at 2.  Dan has been particularly supportive of JNF's partnership with Aleh Negev, which runs a rehabilitation village in Israel for children with severe disabilities.  *Id.* at 1; *Ex. 56 (Bojmel Ltr.*) at 1 ("Dan has a big heart for caring for these most vulnerable people on the planet, the residents of this village").  Immediately after meeting the village's founder, Major-General Doron Almog, at the JNF gala in New York in 2013, Dan leapt to support this cause, making a substantial donation to the Special Education School in the village, which now educates over 150 children.  *Ex. 82 (Almog Ltr.)* at 2.  But, as Major-General Almog explains, he "did more than just provide the funds to lift the project off the ground.  Dan lived the project.  He arranged fundraising events, turned to friends and acquaintances, and even convinced Russell Robinson, JNF-USA

CEO, to provide matching funds for all monies raised towards this innovative project that educates and inspires youth towards understanding, benevolence and charity." *Id.*  In 2014, he visited the rehabilitation village with his daughter, Mia, to show her the importance of giving back and helping those in need.  *Ex. 87 (Robinson Ltr.)* at 2.  As a former employee at Marble Ridge put it, "When Dan was doing his philanthropic work helping build schools in Israel with his family, he seemed so at peace and in a wonderful place.  When he returned I sat down with him and asked him why this made him so happy and Dan's response to me was 'Remember this: we should and will never be remembered for what we did and do at our jobs, but what we leave behind and how we helped others.'" *Ex. 72 (Falcone Ltr.)* at 1.

In another recurring theme, Dan's "leadership by example" led many of his friends and colleagues to not only dedicate their time and resources to supporting these charities but also to take on leadership roles themselves.  *Ex. 56 (Bojmel Ltr.)* at 1 ("Through his passion for helping this group, he brought me on board. Dan has gotten his family and close friends directly involved."); *Ex. 49 (Cowen Ltr.)* at 1 ("His initial introduction ultimately led me to get more involved in JNF and to join the New York board, on which Dan also served."); *Ex. 57 (Burian Ltr.)* at 2 ("In fact, Dan is responsible for introducing me to one of my most important and meaningful charities. I recently served as President of the New York Board of the Jewish National Fund, and have devoted many, many hours to helping the disadvantaged in Israel because of Dan.").

Dan has also taken on, as his own, Amy's support for causes that help pediatric cancer treatment and research, in particular supporting the Memorial Sloan Kettering Cancer Center— the hospital whose cutting-edge treatment helped save Amy's life when she was a teenager. Through his involvement on the Center's survivorship committee, Dan has organized numerous

fundraising events, including MSK's annual Rock & Run event and comedy nights. *Ex. 1 (Amy Blumenfeld Kamensky Ltr.)* at 2; *Ex. 28 (Sharret Ltr.)* at 2 ("Year after year, our close knit group of friends would receive phone calls and email reminders from Dan encouraging us to attend, donate and recruit friends to join in celebrating survivorship at Hudson River Park in Manhattan, and for Comedy Nights that raised additional funds for survivors."); *Ex. 17 (Emilio Savone Ltr.)* at 2.  In 2018, Dan also began volunteering to help build a pediatric cancer hospital in Kyebi, Ghana through the Eugene Gasana, Jr. Foundation.  *Ex. 1 (Amy Blumenfeld Kamensky Ltr.)* at 2; *Ex. 85 (Ultsh Ltr.)* at 1.  Importantly, Dan and Amy have passed on their commitment to helping worthy causes to their daughter, Mia, a talented young artist whose artwork has been published in a book, *Art for a Cure*, with all proceeds going to Memorial Sloan Kettering's department of pediatrics and the Michael J. Fox Foundation for Parkinson's Research.  *Ex. 1 (Amy Blumenfeld Kamensky Ltr.)* at 2 (enclosing copy of Mia's book).

**e.** ██████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

[████████████████████████████████]

[███████████████████████████████]

[█████████████████████████████████]

[█████████████████████████████████]

[███████████████████████████████]

[█████████████████]

### III.     The Offense Conduct and Its Aftermath

Dan's offense conduct occurred over just a few hours on one day, July 31, 2020.  At the time, Dan, on behalf of Marble Ridge, had been participating in intense, time-pressured negotiations to put together the terms of a settlement that the unsecured creditors had obtained in the Neiman Marcus bankruptcy.  For years leading up to that point, Dan—through his firm—had been pursuing fraudulent conveyance claims against the private equity owners of Neiman Marcus ("Sponsors"), who in 2018 had transferred MyTheresa, a fast-growing online retailer that was considered the "crown jewel" of Neiman Marcus's assets, out of the reach of Neiman Marcus creditors for no consideration.  This battle was particularly personal and bitter, with counsel for Neiman Marcus calling Dan at one point in December 2018 to warn him that Ares would come down on him "like a pile of bricks" if he pursued the fraudulent conveyance claims. *Ex. 116 (D. Kamensky Dep. Tr. 53:8-9)*.  But Dan felt that the Sponsors' conduct was sufficiently egregious and detrimental to the interests of Neiman Marcus' creditors that it needed to be pursued.  Once the bankruptcy started and Marble Ridge became a member of the Unsecured Creditors Committee ("Committee"), Dan continued these efforts on behalf of all of

---

[1]  *See, e.g.,* William Wan, *The Coronavirus Pandemic is Pushing America into a Mental Health Crisis*, The Washington Post (May 4, 2020), https://www.washingtonpost.com/health/2020/05/04/mental-health-coronavirus/ ("Data shows depression and anxiety already roiling the nation.").

the unsecured creditors.  On Wednesday July 29, after multiple rounds of negotiations, the Sponsors proposed a further improved settlement of cash and MyTheresa Series B shares to resolve the fraudulent conveyance claims.  Although the amounts proposed in the settlement were not acceptable to bondholders who had been funding and leading the effort to establish the Sponsors' wrongdoing, Dan (on behalf of his firm and other bondholders) and the Committee agreed to work together to seek to obtain the support of bondholders for the settlement. Negotiations were complicated, involving how to allocate the settlement consideration between bondholders and trade creditors, how to classify certain claims, and what type of consideration each class preferred.  Because some trade creditors preferred cash to the illiquid MyTheresa shares being offered, counsel for the Committee asked Dan to have Marble Ridge—and any of the other noteholders that might be interested in participating—provide a cash out option to trade creditors as part of a global settlement.  The Committee then voted on the afternoon of July 29 to authorize its counsel to negotiate such a cash backstop with Dan in exchange for his and bondholders' support for the Plan.  *See Ex. 118 (R. Pachulski Trustee Tr. 101:1*-22 (explaining that if Dan provided a cash backstop "all noteholders could participate" and he would not be able to object to the plan.)  As a potential counterparty, from that point on, Marble Ridge was recused from Committee discussions about the potential cash backstop offer.  Time was of the essence in these multiparty negotiations, as the Bankruptcy Court had set a hearing date just a few days later on that Monday, August 3, for resolving any remaining issues with the debtors' revised Disclosure Statement that would need to include the settlement structure, including the terms of the cash backstop offer.  *See* Order, *In re Neiman Marcus Group, Ltd., LLC, et al.*, No. 20-32519 (D.R.J.) (S.D. Tex. July 30, 2020), ECF No. 1399 (granting approval of the Debtor's Disclosure

Statement and scheduling a hearing for August 3, 2020 at 12:00 PM to "discuss any remaining

issues.").

In the midst of these intense discussions, on Friday, July 31, counsel for the Committee

called Mr. Kamensky and informed him that Jefferies, an investment firm with no prior

involvement in the Neiman Marcus bankruptcy, had reached out to the Committee professionals

to express interest in providing the cash backstop offer for the MyTheresa shares.  The

Committee's counsel informed Dan of this expression of interest even though Jefferies had

specifically asked that it be kept confidential from Dan. *See Ex. 115 (U.S. Trustee statement,*

*Aug. 19, 2020)* at 11-12 ("Mr. Geller's email requested that Mr. Meghji keep Jefferies's bid

confidential from any member of the Committee that was interested in making its cash out offer for

the Series B Shares"; nevertheless, "[Mr. Pachulski and Mr. Meghji] informed [Dan] that another

possible bidder had come forward to discuss making a cash out offer on the Series B Shares.").

Because Jefferies had not been involved in the Neiman Marcus bankruptcy and could have had

little, if any, information about the cash backstop proposal, Dan did not think they could be in a

position to provide the cash backstop by the Monday deadline.  He told Committee counsel he

was concerned that Jefferies might just be engaging in a fishing expedition to obtain information

about a potential trade or to get "cut in" on a deal.  Dan was therefore concerned that Jefferies

would create delay and distraction that could jeopardize the terms and structure of the settlement

which needed to be finalized and incorporated into the Disclosure Statement before the hearing

on Monday, August 3.  When Dan informed Committee counsel of his concerns, the

Committee's counsel, Richard Pachulski, noted to Dan that it would be a "problem" if Jefferies

were merely fishing for information because the parties were under intense time pressure to

create the cash backstop structure.  Dan thought he had reasons to believe his concerns were

valid from his experience and history with Jefferies.  *Ex. 105 (D. Kamensky Trustee Tr. 58:14-16).*

It was in this context that Dan made his call to Jefferies.  Dan had a friendly business

relationship with Joseph Femenia, the Desk Head of the relevant trading desk at Jefferies, and

thought he could get a quick and straight answer from Mr. Femenia about the bona fides of

Jefferies' interest, given that its timing could jeopardize what already was occurring.  On the call,

Mr. Femenia was joined by Eric Geller, who originally had reached out to the Committee

professionals.  Dan recalls starting out by asking Jefferies what interest they had in the shares,

and their response to Dan—that they were trying to source claims to purchase and wanted "half

of the shares" (meaning half of the deal Marble Ridge was then trying to negotiate)—confirmed

his worst fears.  At that point, Dan believed that Jefferies was not acting on behalf of a client that

had the desire and means to make a legitimate cash backstop offer for all of the shares that might

be tendered, but were rather trying to get information about the shares and pricing that Jefferies

could then use to look for potential buyers of any shares they could acquire.  In that moment,

fearing that Jefferies' sudden, opportunistic interest risked jeopardizing the entire cash backstop

structure that had to be finalized by a quickly-approaching deadline, Dan reacted rashly with

anger and frustration.  He admits in those heated moments he urged Jefferies not to bid.  He told

them that Marble Ridge's business relationship with Jefferies would be harmed if they did

submit a bid.  And he informed Jefferies that as a member of the Committee he would make sure

their bid did not succeed.  Those statements were wrong.  As a member of the Committee, Dan

owed a fiduciary duty to the other unsecured creditors and he should never have made those

comments to Jefferies.

As the call proceeded and after admittedly losing his temper and making wrongful comments regarding Jefferies interest, Dan realized that Jefferies had almost no knowledge of the Neiman Marcus bankruptcy, how the unsecured creditors had obtained the settlement with the Sponsors, or how Marble Ridge through its multi-year efforts had kept the fraudulent transfer claim available for creditors. *Ex. 105 (D. Kamensky Trustee Tr. 11:18-21; 88:9-11).* Dan explained to Mr. Femenia the years of work that had gone into litigating the fraudulent conveyance claims that led to the settlement, as well as the intense time pressure the key constituencies faced to finalize the cash backstop structure. *Id. 11:21-23; 88:16-21.* After Dan explained these things, Mr. Femenia said he now understood the issue, and that Jefferies would give further consideration to what they would do and let Dan know. *Id. 12:2-4; 88:23 – 89:1.* Dan believed that the call had ended amicably—despite his initial misguided outburst—and that Jefferies would make their decision based on the totality of the information Dan had provided. *Id.. 11:24-12:2.* Dan was therefore pleased, but not surprised or concerned, when Jefferies called back to say that they would not be bidding. *Id. 12:11-18.* Dan did not instruct Jefferies to keep this discussion secret from the Committee's counsel, even though it was clear that Jefferies would communicate to the Committee's counsel the fact that they no longer intended to bid.

It was only later that evening, when Marble Ridge's counsel told Dan that Jefferies had informed the Committee professionals that they were not going to bid because they had been pressured by Dan, and explained to him the gravity and consequences of his actions, that Dan fully appreciated that his statements could be considered threats and viewed as criminal bankruptcy fraud. Dan was put in a state of shock. *See Ex. 1 (Amy Blumenfeld Kamensky Ltr.)* at 6 ("Dan … stared blankly at his plate … [with] a silent, vacant stare"); *Ex. 7 (Vicki and Joel Blumenfeld Ltr.)* at 5 ("[Dan] returned to the dining room but became quiet and suddenly

appeared pale."). Dan was also confused, because he thought the conversation had ended amicably and that Jefferies had made their own decision based on the points he had made to explain the situation. In that moment, barely able to think and in an utter panic, Dan again called Mr. Femenia to try to understand how things had gone so wrong and to attempt to correct the situation. He said he had not intended to threaten Jefferies. He apologized multiple times. He encouraged Jefferies to bid. He tried desperately to fix the problem he had created with his earlier call. But in doing so, as the Court is aware, Dan said more things that he should not have and made matters worse for himself. And although he told Mr. Femenia several times he was not asking him to lie, Dan has acknowledged that he was trying the "manage the message." *Ex. 105 (D. Kamensky Trustee Tr. 125:1-4)*. Because of that panicked call, Dan has stipulated to and faces the two-level obstruction enhancement in the Guidelines calculation. Dan's offense conduct therefore begins and ends on July 31, and consists entirely of those two calls separated by only a few hours.

Of critical importance is that Dan's conduct on July 31, 2020 resulted in no financial harm to the unsecured creditors. In fact, Jefferies did put in a bid two days later, although it was ultimately rejected by the Trustee appointed by the Bankruptcy Court to administer the post-bankruptcy unsecured creditor trust as "not a good proposal," "not an offer I could recommend to the committee," "not worthy of accepting," and "not actionable" as having too many unacceptable contingencies and conditions. *Ex. 108 (Aug. 3, 2020 email from M. Meghji)* ("Please see attached analysis on Jefferies proposal from last night. It's not workable as it stands."); *Ex. 107 (M. Meghji Dep. Tr. 41:10-11, 41:24)* (Offer was "not an offer I could recommend to the committee" and "not worthy of accepting"); *Ex. 106 (M. Meghji Trustee Tr. 85:11-14)* ("It was very complicated. It had a lot of caveats . . . It was just, you know, frankly not a

good proposal."). Moreover, additional and higher bids from Citi, Centerbridge, and Brigade followed. *Ex. 109 (Sept. 8 , 2020 email from M. Nishida)* ("[Citi] can show a firm bid for a specific size for any claim holder that may look to sell better than GUC Convenience Recovery."), *Ex. 110 (Aug. 7, 2020 email from M. Vivek)* ("[C]ould [Centerbridge] still try to bid if we wanted?  Recognize it would need to be higher then [*sic*] Jeffries just wonder if its [*sic*] already done[.]"), *Ex. 107* (*M. Meghji Dep. Tr. 58:21-24*) (describing that Brigade "[v]erbally" expressed its interest in bidding).  Indeed, Dan was always aware from Marble Ridge's counsel's discussions with Committee counsel that, once the cash backstop was in place and publicly disclosed, others would have the opportunity to provide "topping bids" above whatever level was negotiated between the Committee and Marble Ridge.  In the end, after assessing the various options, the Committee professionals decided not to accept a cash backstop offer, and to instead hold the shares in a trust for the benefit of the unsecured creditors.  *Ex. 107 (M. Meghji Dep. Tr. 56:18-57:13)* ("Fundamentally, I reached — my firm and I reached the conclusion that maximizing the value of the 140 million my preference — MyTheresa pref B shares, that the committee had received or the unsecured creditors had received, the value of those could be maximized by deferring the monetization of those shares to a later time.").  Ultimately, the unsecured creditors—in large part thanks to Dan's efforts in pursuing that fraudulent conveyance claims on their behalf—received valuable MyTheresa shares as part of the settlement.

Since July 31, 2020, Dan has done everything in his power to take responsibility for his conduct and try to make things better.  He encouraged Jefferies to bid—which they promptly did.  He immediately withdrew from the Committee.  He cooperated fully with the U.S. Trustee's investigation, and then testified voluntarily while first apologizing for and admitting to his errant conduct.  *Ex. 105 (D. Kamensky Trustee Tr. 6:3-7, 7:16-20)*.  As part of his court-approved civil

settlement in the Neiman Marcus bankruptcy, he agreed never to serve again on any official bankruptcy committee; subordinated all of his personal claims in the Neiman Marcus bankruptcy to those of other creditors; voluntarily donated $100,000 to designated charities, including creation of a scholarship at the University of Houston Law School to honor the memory of the former Assistant U.S. Trustee for the district where the Neiman case was pending, who had earlier succumbed to COVID-19; and he has already voluntarily performed over 200 hours of community service, including teaching at law and business schools on the lessons to be taken from mistakes he made that day.  These lectures target the incoming generation of law and finance leaders who can benefit from these lessons, and include, among others, NYU School of Law, NYU Stern School of Business, Duke University School of Law, and The Wharton School of the University of Pennsylvania, where he has used his experience as a "life-lesson" to teach students not to make the mistakes he has made. *Ex. 93 (Hon. Arthur Gonzalez Ltr.)* at 2. The responses from the students have been powerful.  *Ex. 95 (Ed Altman Ltr.)* at 1; *Ex. 111 (Prof. de Fontenay Email)*.

In addition to sharing his lessons with other students and professionals, Dan has also willingly and with enthusiasm worked to provide for others on a more tangible charitable level. Dan has volunteered at the Interfaith Nutrition Network (Mary Brennan INN) and at the Met Council Food Pantry.  *Ex. 97 (Singh Ltr.)* at 1 (describing that, as of April 6, 2021, Dan has completed 97 volunteer hours, doing the physical labor of moving and fulfilling food donations, handling everything from intake of pallets of donations into the facilities to working directly to deliver them to families coming through for help; the director observed that he "maintains a positive attitude throughout the day and takes on every humble task with enthusiasm."). Following the U.S. Trustee's Report and prior to his arrest, Dan also made the difficult but

responsible decision to voluntarily appoint independent managers to close and liquidate Marble

Ridge.  And of course, consistent with his desire to take responsibility for his actions, he agreed

to plead guilty—pre-indictment—to the instant offense, making him a convicted felon. The

severe consequences that Dan has suffered—and continues to suffer—serve as a cautionary tale

for the entire bankruptcy and finance community.

## IV.   A Non-Custodial Sentence Involving a Term of Probation and Community Service Serves The Purposes of Section 3553(a)

### A.   Applicable Sentencing Guidelines Range

The parties have stipulated pursuant to the plea agreement that the applicable Sentencing

Guidelines base offense level is 14 under §2J1.3.  Following a two-level increase under §3C1.1

for obstructing or impeding the administration of justice and three level reduction for acceptance

of responsibility under §3E1.1.(a) and (b), the applicable Guidelines offense level is 13.  At

criminal history category I, that results in a Guidelines range of twelve to eighteen months'

imprisonment and a fine of $5,000 to $55,000.  As this is a Guidelines range within Zone C, the

minimum term can be satisfied by a sentence including one-half of the minimum term of

imprisonment, or six months' imprisonment, with the remainder under a term of supervised

release with community confinement or home detention.  U.S. Sent'g Guidelines Manual

§5C1.1(d).

As the Court is well aware, in considering an appropriate sentence, the Court should not

"presume that the Guidelines range is reasonable . . . [the Court] must make an individualized

assessment based on the facts presented."  *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

Courts must consider their "own sense of what is a fair and just sentence under all the

circumstances" in applying the factors set forth in 18 U.S.C. §3553(a).  *United States v. Jones*,

460 F.3d 191, 195 (2d Cir. 2006).

**B.     The Application of Section 3553(a) Sentencing Factors Weigh In Favor of A Sentence of Term of Probation and Community Service**

In applying the Section 3553(a) sentencing factors to Dan and the offense conduct here, we respectfully submit that a sentence of probation, with a condition of community service is a sentence that is "sufficient, but not greater than necessary to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).

### a.  The Nature and Circumstances of the Offense

In considering the nature and circumstances of the offense, a number of critical and mitigating factors bear emphasis.

First, Dan's offense was extremely short-lived.  Born out of an intense and stressful situation, Dan acted—or more accurately reacted—to what he feared was an approach by Jefferies that potentially jeopardized the settlement structure that had to be finalized over a weekend.  He feared that Jefferies was simply seeking to get in on the action and that they were not actually making a serious or real bid for all of the MyTheresa shares.  When he thought his fears were confirmed by Jefferies' statement that they were interested in acquiring just half of the shares (even though the cash backstop offer being negotiated required the bidder to offer to purchase the shares of all of the unsecured creditors), Dan reacted emotionally with statements that breached his fiduciary duties.  Dan was unquestionably wrong to say the things he did to Jefferies on that call and he quickly admitted as much.  But unlike most white-collar frauds that come before this Court, Dan's offense was not the product of premeditation or a well thought-out plan.  Indeed, it reflected impulsive behavior that arose from a *lack* of careful thought.

Second, telling Jefferies not to bid and saying that Jefferies' business relationship with Marble Ridge would be harmed if they did bid does not involve the type of fraudulent behavior present in most other criminal cases.  The offense here is not inherently immoral or deceptive but

rather stems from the existence of—and thus, the breach of—Dan's fiduciary duty owed to unsecured creditors generally. Dan did not ask Jefferies to keep that call secret from the Committee's counsel. He understood Jefferies would have to inform the Committee that they did not intend to bid. And when Jefferies informed Dan after their first call that they would be withdrawing their interest in bidding, he was relieved, thinking that his explanation about the complexity of the situation had convinced Jefferies not to bid. Dan did not fully appreciate the gravity of the situation until Marble Ridge's counsel explained to Dan later that evening how the first call had been received by Jefferies and the potential consequences of Jefferies' view of what Dan had said. In short, Dan's misconduct did not involve any type of premeditated fraud or deception, but rather a breach of a fiduciary duty that, in the context, amounted to a criminal bankruptcy offense.

Third, in considering Dan's conduct, the context of conflicts of interest inherent in bankruptcy creditors' committees generally and in Dan's position on this Committee specifically is also relevant. Fiduciary duties created by membership in bankruptcy committees are not as clear cut as they are in other contexts. As Courts have often recognized, "[a]lthough Committee members owe fiduciary duties, they are hybrids who serve more than one master. Every member of the Committee is, by definition, a creditor. Thus, he is in competition with every other creditor for a piece of a shrinking pie. He may assert his rights as a creditor to the detriment of the creditor body as a whole without running afoul of his fiduciary obligations." *In re Rickel & Assocs., Inc.*, 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002).[2] Moreover, here, because the

---

[2]  In addition, the duty of a creditors' committee is to seek to maximize the overall recovery for the creditors. That does not necessarily mean accepting the highest bid; rather, creditors' committee members must also take into account other factors, including contingencies, conditions, timing and other uncertainties. *In re Mountain States Rosen, LLC*, 619 B.R. 750, 754 (Bankr. D. Wy. 2020) ("The fiduciary duty [to maximize the value of the estate] does not require Debtor to mechanically accept a bid with the highest dollar amount. Debtors are permitted, and in fact are encouraged, to evaluate other factors such as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing."); *In re Fam. Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015)

Committee (for the benefit of all the unsecured creditors) had specifically asked and actively encouraged Marble Ridge to make a cash backstop proposal and had voted to continue negotiations with Marble Ridge, Dan had been recused from the Committee discussions about the backstop offer.  In other words, Dan was asked to present this opportunity for a cash backstop offer for the Committee, and as a result faced an open and transparent conflict as both a member of the Committee and a potential bidder for the cash backstop offer.  In such a context, the duty that Dan owed to the Committee in connection with the cash backstop proposal—and breached—was far from crystal clear.

Indeed, one can question whether recusing Dan and Marble Ridge from the Committee's discussions about the cash backstop offer was sufficient, and whether the Committee should have decided that Marble Ridge should no longer serve on the Committee once a decision was made to negotiate a cash backstop offer with Marble Ridge.  If such a decision had been made, Dan would no longer have owed any duties to the Committee and would likely be in a different position than he is now.  Nor would he be in his current position if Committee counsel had kept Jefferies' interest confidential from Dan, as Jefferies had requested, or had created an information barrier to keep sensitive information from Dan as is often done in competitive bidding situations.  Again, without raising it as an excuse, or minimizing his actions in any way, it is worth noting that any number of these fortuitous circumstances would have led to entirely different outcomes.

Fourth, Dan and Marble Ridge had almost single-handedly, through years of effort, created the very recovery for the unsecured creditors that was the subject of the cash backstop

---

("The Debtors are permitted, and in fact are encouraged, to evaluate other factors such as contingencies, conditions, timing or other uncertainties in an offer that may render it less appealing."); *In re 160 Royal Palm, LLC*, 600 B.R. 119, 130 (S.D. Fla. 2019) ("The Debtor's duty is to maximize value to the creditors, and that maximization includes considerations such as finality, stability, and expeditious resolution of the bankruptcy proceeding.").

offer.  There would have been no settlement for the unsecured creditors without Dan.  At a time

when no one else saw or was willing to commit the resources to prosecute fraudulent conveyance

claims against Neiman Marcus' Sponsors, Marble Ridge did so.  That Marble Ridge had pursued

those claims (at great effort and expense) and achieved success on behalf of all of the unsecured

creditors, suddenly to find those efforts jeopardized by what he feared was an opportunistic

approach by a party that did not know or appreciate the history and complexity of the situation,

helps put Dan's emotionally charged reaction to Jefferies' expression of interest in context ███

███████████████████████████████████████████, even if it does not

excuse it.  Ironically, the very recovery that Dan, through his efforts, obtained for all the

unsecured creditors—the MyTheresa shares that were being received as part of the settlement for

the fraudulent conveyance claims—has led to the criminal charges against him for breaching his

duty to those same unsecured creditors.

     <u>Finally</u>, and perhaps most importantly, as noted before, Dan's offense resulted in no

actual economic harm to the members of the Committee to whom Dan owed fiduciary duties.

His conduct did not affect or impede the bidding process.  Jefferies put in their bid shortly after

the calls on July 31.  And in the following days and weeks, as anticipated, a number of other

interested parties bid.  In the end there was no cash out option, not through Dan's actions, but

because  the professionals for the creditors' trust rejected the need for it.   Moreover, the Trustee

appointed to oversee the post-effective date trust determined that Jefferies' bid had too many

conditions and problems to make it acceptable, and ultimately decided not to pursue any of the

bids, including a subsequent bid by Marble Ridge, concluding that it was in the unsecured

creditors' best interest for the Committee to hold onto the shares in trust and to defer the

monetization of those shares to a later date. *Ex. 107 (M. Meghji Dep. Tr. 56:18-57:13)*

(describing his conclusion that the MyTheresa Series B shares' value "could be maximized by deferring the monetization of those shares to a later time."). Thus, Dan's actions during those few hours on July 31—although devastating in its impact on Dan, his family and his life—imposed no economic harm to any of the unsecured creditors.

The nature and circumstances of Dan's offense—a short-lived breach of fiduciary duty in the context of complicated and competing interests that resulted in no harm—weigh heavily against a severe sentence here.

### b.  History and Characteristics of the Defendant

Dan's personal history and characteristics are mitigating factors that should be considered in support of a non-custodial sentence. The dozens of letters submitted in support of Dan confirm how uncharacteristic of Dan those few hours on July 31, 2020 were for Dan. The letters show that Dan—both in his professional and personal life—consistently acted with honesty and integrity. Putnam Coes, the Chief Operating Officer of Paulson & Co. during Dan's tenure at the firm, described Dan's "absolute candor and no-shade honesty" as an "immovable feature" of his character and cites his "commitment to clarity of facts and truth" as "a primary reason why [Paulson] placed a great deal of trust in Dan, trust backed by billions of dollars of at-risk capital." *Ex. 74 (Coes Ltr.)* at 1. Marc Heimowitz, a bankruptcy attorney who estimated that he has worked on at least 30 matters with Dan, remarked, "In all the years I have known Dan, I have neither seen him engage in nor heard of him engaging in conduct remotely comparable [to the events of July 31]. To the contrary, my experience is that Dan strove to act scrupulously and to avoid even the appearance of impropriety." *Ex. 50 (Heimowitz Ltr.)* at 1. Even those with whom Dan competed in business found him not only honest and fair, but collaborative and cooperative. Jed Nussbaum, the managing partner at a rival investment firm remarked, "[h]aving worked with

Dan on numerous investments, I believe [his actions on July 31] run[] counter to how I always saw him conduct himself in our professional actions." *Ex. 47 (Nussbaum Ltr.)* at 2. Evan Lederman, a former partner at another rival investment firm, echoed this sentiment, recalling that even when Dan was across the table, "[h]e always played fair." *Ex. 44 (Lederman Ltr.)* at 2 ("I have worked with Dan on tons of investments, and I can say on every single one of them he conducted himself with integrity, honesty and reasonableness. He never tried to get ahead by cutting corners, by backstabbing or by manipulation."). Saul Burian, who worked opposite Dan in the Lehman Brothers bankruptcy, likewise remarked that Dan "used his intellect, credibility and integrity to bring creditors together in support of a mutually beneficial global solution to Lehman's domestic bankruptcy cases. None of this would have happened absent Dan's open and honest approach that built trust across the capital structure." *Ex. 57 (Burian Ltr.)* at 1. Those who know Dan on a more personal level also emphasize his honesty and integrity. *See, e.g.*, *Ex. 21 (Kelly Mamaysky Ltr.)* at 2 ("In the two decades I have known him, I have never seen Dan act dishonestly, nor intentionally hurt another human being."). Finally, the independent liquidators appointed by Marble Ridge's investors to oversee and supervise the wind-down of the Marble Ridge funds indicate that Dan "has acted with honesty, has been forthright with the JVLs and has acted with integrity." *Ex. 96 (Kennedy Ltr.)* at 2.

In addition, Dan's former employees describe a compassionate manager committed to fostering a transparent and collaborative work culture. In their letters, former employees consistently praised Dan's deep personal and professional commitment to their well-being. *Ex. 73 (Caiazzo Ltr.)* at 1 ("[D]an cared about each and every member of his team at Marble Ridge and our families, which meant the world."). John Falcone, who began working at Marble Ridge in 2015, explains that while his father was in ill health, Dan would visit Falcone's office every

morning, often encouraging him to "[t]ake tomorrow off to be with Dad." *Ex. 72 (Falcone Ltr.)* at 1. Indeed, to many employees, Dan was not only a "boss," but also a "friend, confidante and mentor" who inspired his team by being able to put "a positive spin to even the darkest of situations." *Id.* at 1-2. As his former CFO wrote, "[Dan was] honest, hardworking, and caring. He valued my input and opinion. He challenged me and made me a better professional." *Ex. 71 (Pearson Ltr.)* at 1. In perhaps the ultimate display of admiration, Dan's executive assistant hopes that yet unborn child will one day become a man like Dan. *Ex. 73 (Caiazzo Ltr.)* at 2.

Dan's upstanding character extends to his exemplary family life. Part of a very close-knit family, Dan is a loving husband to Amy and doting father to Mia. He stood by Amy's side through her multiple cancer diagnoses and treatments. *Ex. 1 (Amy Blumenfeld Kamensky Ltr.)* at 3. Family friend Kelly Mamaysky shared an anecdote that exemplifies Dan's relationship to his daughter: "I remember visiting Amy and Dan at their home the summer before the pandemic, and watching Mia put on spontaneous tap-dancing performance after dinner. Dan radiated pride at this impromptu show outside their kitchen, and Mia beamed as well, clearly aware of Dan's unwavering support for all of her pursuits. Dan shows similar pride and interest when discussing Mia's artwork, which has been displayed prominently on the walls throughout their home since Mia was very young." *Ex. 21 (Kelly Mamaysky Ltr.)* at 1-2. Dozens of letters submitted by those who know Dan across all areas of his life—professionally, personally, in his community, and through his charitable endeavors—confirm his unwavering support of his family. *See, e.g., Ex. 71 (Pearson Ltr.)* at 1 ("I was in Dan's office multiple times when he was on the phone with his daughter and the love and support for her showed every time."); *Ex. 13 (A.J. Levin Ltr.)* at 2 ("Dan is a wonderful husband and father."); *Ex. 53 (Kerrigan Ltr.)* at 1 ("Dan absolutely radiates when he speaks of his wife and daughter. They are everything to him, and never far from his

mind."); *Ex. 18 (Tracy Ltr.)* at 1 ("Dan has been an incredible father and supportive of [Mia's] creative talents."); *Ex. 73 (Caiazzo Ltr.)* at 1 ("He is a true family man—proud of his wife and daughter and all of their accomplishments and always wanting to hear the same about yours."); *Ex. 86 (Castellano Ltr.)* at 1 ("His family was his priority above all else.  I told him how much I admired his love towards his wife and daughter.").

Dan's genuine care for others extends beyond his personal and professional family to the community around him.  That is evidenced by his long list of charitable deeds and contributions. His commitment to supporting different communities and those in need has been longstanding, wide-ranging, and deep.  He and Amy have been active in supporting Mia's elementary school, the Schechter School, one year anonymously donating half of the school's annual operating budget to keep it open.  *Ex. 88 (Sokol Ltr.)* at 1.  For over a decade, he has supported the JNF, playing an integral role in building Aleh Negev, a long-term care village in Israel for individuals with severe disabilities, and Tikkun Olam, a program administered through the Israeli Ministry of Education to "educate generations of Israeli children to accept, include and support" children with disabilities.  *Ex. 82 (Almog Ltr.)* at 2.  Dan also took Amy's cancer "survivorship story as his own," organizing a 5k walk/run and fundraisers for Memorial Sloan Kettering Hospital.  *Ex. 1 (Amy Blumenfeld Kamensky Ltr.)* at 2.  Since 2018, he has been volunteering his time and resources to help the Eugene Gasana, Jr. Foundation build a pediatric hospital in Ghana. *Ex. 85 (Ultsh Ltr.)* at 1.  Importantly, the accounts of his charitable endeavors describe a man committed not only to providing monetary support, but to leading the charge to help those in need and inspiring others to do the same.  *Ex. 86 (Castellano Ltr.)* at 1 (describing how Dan not only pledged to participate in a charity triathlon, "but he also mentioned it to his coworkers and friends who also joined the team"); *Ex. 69 (Steiner Ltr.)* at 1 ("I remember Dan was always

asking for a donation for one cause or another."); *Ex. 10 (Jerrold Kamensky Ltr.)* at 2 (describing how, "through the guidance of Dan and Amy, [Mia] published a book of her art produced as a child between the ages of six (6) and eleven (11)," with "all of the funds go[ing] to Parkinson's disease and cancer organizations").

Finally, Dan's character has been on display since the events of July 31. He immediately owned up to his mistakes and has done everything in his power to make up for them. As Dan's parents put it, "he did what we always taught him to do if he ever made a mistake—admit wrongdoing and do everything possible to correct course and make things better." *Ex. 2 (Judy and Marvin Kamensky Ltr)* at 4. Dan made sure his actions did not harm anyone. He withdrew from the Committee, subordinated all of his personal interests in the bankruptcy to the interests of others, and agreed never to serve again on any bankruptcy committees. Despite the risks, including the criminal exposure (which has come to pass), he cooperated fully with the U.S. Trustee's investigation, testifying voluntarily, starting his testimony with an acknowledgement of his wrongdoing and an apology to everyone involved. Following the U.S. Trustee's Report, in order to protect the interests of his investors, he brought in an independent liquidator to fairly and efficiently distribute the assets to his investors. *Ex. 96 (Kennedy Ltr.)* at 1. In the liquidators' view, Dan has directed Marble Ridge to fully cooperate with the liquidation process, and he has acted with honesty and integrity throughout the liquidation process. *Id.* He settled all of his claims in the bankruptcy, and as part of that settlement, he voluntarily committed to perform 200 hours of community service and to teaching in business and law schools. At the Mary Brennan INN soup kitchen, Dan has taken on his community service with "enthusiasm," "drawing on his Spanish speaking skills to communicate effectively with [guests]" and using humor to help "alleviate their anxiety." *Ex. 97 (Singh Ltr.)* at 1. He has already taught in

various law and business schools and has plans to continue doing so, and is developing a case study with a faculty advisor to help students learn from his mistakes.  Those lectures have been very well received, with professors and students remarking on Dan's honesty and character.  *Ex. 95 (Ed Altman Ltr.)* at 1 (Prof. Altman of NYU noted his "appreciation of Dan's character, honesty and current state [was] positively reinforced" by his presentation); *Ex. 93 (Hon. Arthur Gonzalez Ltr.)* at 2; *Ex. 111 (Prof. de Fontenay Email)*.

The over 100 letters submitted in support of Dan confirm that he leads a good and meaningful life.  He has been honest, hard-working, caring, compassionate, and generous.  The few moments of panic on July 31, during a particularly stressful period of time in the heart of the pandemic, ██████████████████████████████████, do not represent Dan as a person.  In this case, the history and characteristics of the defendant weigh very much in favor of a lesser sentence.

### c.   Sentencing of Similarly Situated Defendants

The treatment of similarly situated defendants is also an important sentencing factor—a fair sentence must take into account how other similar conduct has been treated.  18 U.S.C. § 3553(a)(6) ("The court, in determining the particular sentence to be imposed, shall consider…the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."); *U.S. v. Booker*, 543 U.S. 220, 259-260 (2005) ("The [Federal Sentencing] Act nonetheless requires judges to consider…the need to avoid unwarranted sentencing disparities.").  Here, a criminal prosecution alone—regardless of sentence—puts Dan in the harshest extreme for similar conduct.  The crime of which Dan stands convicted—offering money or property for acting or forbearing to act in a bankruptcy in violation of 18 U.S.C. § 152(6)—has rarely been charged.  In fact, despite being the home to one

the nation's busiest bankruptcy courts, we have found no case in the Southern District of New York—before this one—charging Section 152(6).  A nationwide search reveals only two reported decisions in criminal cases over the last ten years involving Section 152(6).[3]  Both involved distinguishable and far more egregious conduct than is the case here.

In *United States v. Singh*, No. 12-cr-352 (MCE), No. 14-10521 (9th Cir. 2016), the defendant had engaged in a Ponzi scheme.  As his fraud scheme began to unravel, he sought to protect himself by filing for bankruptcy, and having done so, Singh continued to engage in his criminal behavior.  He informed his Ponzi scheme victims that he would maintain a "good" and "bad" list.  Those who refrained from bringing claims in the bankruptcy proceedings would be on the "good" list and he promised would be repaid after the proceeding.  And those who actually sought recovery in the bankruptcy would be on the "bad" list and left with nothing.  Although Singh was charged with Section 152(6), he ultimately pled guilty to making a false bankruptcy declaration under 18 U.S.C. § 152(3).  Plea Agreement 2:11-12, *United States v. Singh*, No. 12-cr-352 (MCE), No. 14-10521 (9th Cir. 2016), ECF No. 37.  In *United States v. Peel*, 595 F.3d 763 (7th Cir. 2010), the defendant filed for bankruptcy and sought to discharge a $200 per month financial obligation that he owed his ex-wife.  To coerce her into forfeiting her claims in the bankruptcy, the defendant blackmailed her with nude photographs of her sister as a child.  The defendant was convicted of violating 18 U.S.C. § 152(6), along with child pornography and obstruction of justice.  *Id.*  In short, Section 152(6) is almost never charged, and in the rare instances it was, it has been for far more egregiously criminal conduct.

---

[3]  We conducted a nationwide Bloomberg Law search for dockets from any date citing any subsection of 18 U.S.C. § 152, as well as a nationwide Lexis Courtlink search for the same terms covering the past ten years.  From there, we manually reviewed results to determine whether Section 152(6) was charged in each case.  We also conducted a nationwide search for court dockets citing 18 U.S.C. § 152(6) specifically.

It is not just Section 152(6) prosecutions that are rare, but bankruptcy offenses under Section 152 generally. A legal database search revealed only six reported criminal cases in the Southern District of New York in the last 30 years involving any subsection of 18 U.S.C. §152 (with two of them charged in other Districts and transferred here).[4] All of those cases are distinguishable from this case in that they involved debtors who made false submissions and statements to hide their own assets in bankruptcy.[5] Debtors making false submissions to hide and protect assets from the creditors goes to the heart of bankruptcy process and involves the type of deliberate and premeditated fraud that is missing in Dan's case. Indeed, commentators have noted how "remarkable" and unusual it is for Dan's conduct—involving underlying assets that are not the property of the estate, but rather "agreements between creditors to monetize non-cash distributions"—to be a subject of a bankruptcy fraud charge. *See* Stephanie Wickouski, *Kamensky Forces More Scrutiny on Committee Process*, Locke Lord (Mar. 1, 2021), https://www.lockelord.com/newsandevents/publications/2021/03/kamensky-forces-more-scrutiny ("What is remarkable is the government's position that a breach of fiduciary duty in a bankruptcy case is criminally fraudulent.").

---

[4] We conducted Bloomberg Law searches for S.D.N.Y dockets citing to any subsection of 18 U.S.C. § 152 and reviewed all results manually.

[5] *See, e.g.*, Superseding Information at 2, *United States v. D'Alessio*, No. 18-cr-00617 (JMF) (S.D.N.Y. 2018), ECF No. 21 (Defendant charged with knowingly and fraudulently submitting forms that omitted money and property belonging to his estate.); Compl. at 1-2, *United States v. Dememjon*, 16-cr-00006 (LAK) (S.D.N.Y. 2016), ECF No. 1 (Defendant signed false financial statements and concealed assets.); Indictment at 2-3, *United States v. Nisimov*, 11-cr-00573 (LAP) (S.D.N.Y 2011), ECF No. 12 (Defendant made numerous false statements including false entries in business records of an entity he controlled in a scheme to defraud the court and his creditors); *United States v. Wise*, 17-cr-00132 (LTS) (S.D.N.Y. 2017) (transferred for purposes of probation from MDPA) (Defendant submitted schedules of his assets and a statement of financial affairs that fraudulently omitted the fact that he was the holder of a $2.4 million promissory note); *United States v. Bonavito*, 14-cr-00690 (KPF) (S.D.N.Y 2014) (transferred for purpose of probation from NDCA) (Defendant signed false financial statements and concealed assets); Information at 1, *United States v. Daniels*, 10-cr-00548 (KMK) (S.D.N.Y. 2010) (Defendant made a false oath with respect to his ownership of property in his bankruptcy case).

A review of the data maintained by the U.S. Sentencing Commission also confirms the rarity of Section 152 charges generally and Section 152(6) charges in particular.  A search across all of the Commission's data for approximately 1.5 million criminal sentences reported to the Commission between October 1, 1998 and September 30, 2019, shows only two federal sentences with 18 U.S.C. § 152(6) listed as a statute of conviction.[6]  *Ex. 112 (MCM Data Consulting Apr. 9, 2021 Memorandum)* at 2.  One defendant was sentenced to one count of 18 U.S.C. §152(6) on April 25, 2003 in the District of Maryland and the other to four counts of 18 U.S.C. §152(6) and 152(3) on March 20, 2002 in the Central District of California.  Both defendants received non-custodial sentences of probation, one year for the first and three years for the second.  *Id.*

The lack of criminal prosecutions for this type of misconduct is not surprising.  The Bankruptcy Code has built into it mechanisms for bankruptcy courts to address misconduct, including breaches of fiduciary duty and conflicts of interest, without involvement of the criminal authorities.  For example, the Bankruptcy Code provides for the equitable subordination or disallowance of wrongdoer's claims, 11 U.S.C. § 510(c); the disregarding of creditors' votes that are found to have been made in bad faith, 11 U.S.C. § 1126(e); the avoidance of a sale if the price was controlled by an agreement among potential bidders, 11 U.S.C. § 363(n); the appointment of an examiner or trustee to investigate wrongdoing, 11 U.S.C. § 1104; and other equitable remedies including the imposition of costs, fees and contempt, 11 U.S.C. § 105(a).  A review of bankruptcy case law reveals countless cases involving misconduct, bad faith, and

---

[6]  The Sentencing Commission data does not include defendant names or docket numbers.  However, it does include the defendant's sentence, the sentencing date, the District in which the sentencing occurred, and the statute of conviction.  Complete sentencing data are available at http://www.ussc.gov/research/datafiles/commisssion-datafiles.

breaches of fiduciary duty resolved in bankruptcy through remedies prescribed in the Bankruptcy Code.[7]  These cases almost never lead to criminal charges.

The dearth of criminal charges in the bankruptcy context—in fact, none that we have found involving conduct analogous to the conduct here—does not mean, of course, that a criminal prosecution here is precluded or inappropriate.  Dan has acknowledged and pled guilty to a criminal offense.  However, in considering the appropriate sentence, we respectfully submit that the Court should consider that the bringing of criminal charges alone makes this case an outlier when looking at similar conduct.

### d.  General and Specific Deterrence

A sentence of incarceration in this case is not necessary to vindicate the public interest in general and specific deterrence.  Although it is unquestionably important to deter others from breaching their fiduciary duties on creditors' committees and to deliver a message that there will be serious consequences from doing so, that message already has been sent loud and clear.  Dan's mistakes have been highly publicized and met with shock.[8]  As noted above, misconduct in bankruptcies have rarely led to criminal prosecutions—particularly if it was not part of a

---

[7]  *See, e.g.*, *In re Allegheny Int'l, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990) (pervasive pattern of bad faith, breach of fiduciary duty, and manipulation of bankruptcy process" by a creditor addressed through disqualification of creditor's votes, shares held in trust, and establishment of process to resolve issues); *Citicorp Venture Cap., Ltd. v. Comm. Of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3d Cir. 1998) (Bankruptcy Court addressed intentionally breach of fiduciary duty by controlling shareholder's use of inside information to purchase debtor's claims through equitable subordination of claim); *United Steelworkers of Am. v. Lampl (In re Mesta Mach. Co.)*, 67 B.R. 151 (Bankr. W.D. Pa. 1986) (finding of breach of fiduciary duties and "a possible fraud on the court" by committee obtained an order for transfer of funds that would "personally benefit" members and counsel handled in Bankruptcy Court through disgorgement of funds); *In re Signature Apparel Grp. LLC*, 577 B.R. 54 (Bankr. S.D.N.Y. 2017) (finding that principals of the debtors and the parent company of a licensor made false representation to the court that the license had been terminated prepetition and as a result breached fiduciary duties resolved by Bankruptcy Court through imposition of damages.)

[8]  *See, e.g.*, Matt Robinson & Katherine Doherty, *Hedge Fund Founder Kamensky Draws U.S. Charges in Neiman Bid*, Bloomberg News (Sept. 3, 2020), https://www.bloomberg.com/news/articles/2020-09-03/marble-ridge-s-dan-kamensky-sued-by-sec-over-neiman-bankruptcy ("Even more unusual is the prospect of a fund manager facing criminal charges for actions they take in serving on special panels that are meant to protect creditors in bankruptcy cases.").

broader fraud or crime and where, as here, there were no victims.  Even before Dan's arrest, the

consequences of Dan's breach of fiduciary duty were a cautionary tale for any member of an

official bankruptcy committee.  The U.S. Trustee's report and bankruptcy settlement have put all

parties on notice of the severe consequences of failing to uphold one's fiduciary duties.[9]  And,

his precipitous fall from a highly successful fund manager to a convicted felon has been followed

closely by the bankruptcy and finance communities.  They have read about him being charged,

hand-cuffed, and arrested in front of his family.  They have witnessed him close and liquidate his

fund and seen him charged in an enforcement action by the SEC.  And of course, they have seen

him convicted of a felony.  The entire community has witnessed the devastating consequences of

Dan's breach of his fiduciary duty on July 31.  No greater need exists to send yet a stronger

deterrent message by sending Dan to prison.[10]

A term of imprisonment is also entirely unnecessary for purposes of specific deterrence.

Dan has voluntarily agreed to a lifetime ban from serving on an official bankruptcy committee.

He has liquidated his fund and he will likely be suspended or barred from serving as an

investment advisor by the SEC.  Dan will never again be in a position to engage in the type of

misconduct at issue here, and he does not need to be sent to jail to protect against that possibility.

---

[9]  *See, e.g.*, Andrew Scurria & Alexander Gladstone, *Hedge Fund Marble Ridge to Close After Scathing Neiman Report*, The Wall Street Journal (Aug. 21, 2020), https://www.wsj.com/articles/hedge-fund-marble-ridge-to-close-down-11598014779?st=pizpxgx3kqhu1i1&reflink=share_mobilewebshare ("Marble Ridge Capital LP, a hedge-fund firm known for investing in distressed companies, is shutting down after a government inquiry found that founder Dan Kamensky tried to suppress bidding for a piece of bankrupt retailer Neiman Marcus Group Ltd.").

[10]  In addition, whatever happens to Dan, it will not change the inherent conflicts of interest that exist in serving on a bankruptcy committee and are often challenging to navigate.  A sentence of incarceration—in addition to the professional and personal devastation that Dan has suffered—could potentially have the effect of chilling creditors from committee membership as it would substantially increase the risks of such service.  This issue is not just theoretical.  In *In re Tuesday Morning Corp.*, No. 20-cv-31476 (Bankr. N.D. Tex. Dec. 22, 2020), the Equity Committee Counsel noted that the U.S. Trustee's position (which was rejected by the Court) in a post-Neiman world of how to manage conflicts of interest would mean that "as a policy matter" adopting the UST's position could prevent the "next [Committee Member] from stepping forward [with a backstop proposal]".  *Ex. 117 (Confirmation Hearing Tr. 225:20-25)*.

But more fundamentally, Dan has absolutely learned his lesson.  He is profoundly remorseful and utterly "distraught by the ripple effect of his mistake" and its consequences for his professional and personal contacts.  *Ex. 1 (Amy Blumenfeld Kamensky Ltr.)* at 7.  His "heart ache[s] for what his daughter [is] going through," *Ex. 20 (Harry Mamaysky Ltr.)* at 2, and he is "ashamed" that closing Marble Ridge required him to lay off all of his employees, "people he cares deeply about." *Ex. 9 (Witman and Blumenfeld Ltr.)* at 3.  Dan has fully accepted responsibility for his conduct.  *See, e.g.*, *Ex. 27 (Goode Ltr.)* at 2 ("Dan has personally expressed his deep regret for his actions related to this sentencing to me . . . Dan has acknowledged and accepted his responsibility for his mistakes."); *Ex. 46 (Shams Ltr.)* at 2 ("In my personal conversations with Dan, I find him to be truly penitent and ready to accept the consequences of his actions.").  *Ex. 41 (Carr Ltr.)* at 2 ("The one thing he kept talking about was how his actions have hurt his family and friends.  Not about how it may have hurt him or his career.  But, how it was hurting those he cares about.").  As his wife Amy reported, since July 31, 2020, she has "been living with a man thoroughly consumed by remorse and regret." *Ex. 1 (Amy Blumenfeld Kamensky Ltr.)* at 6.  He poses no risk that he will ever do anything like he did on July 31, 2020 ever again.  If anything, he has sought to help others understand how important it is to learn from his mistakes.

The destruction that his actions have brought on Dan's professional and personal life has been swift, brutal, and public.  The bankruptcy and investment professional communities have all followed Dan's case closely and a clear message has already been sent—that even momentary failures to comply with fiduciary duties can have devastating consequences.  And this is a message and lesson that Dan himself has embraced.  He understands that one of the few good things that could come of all of this is for him to serve as an example for others.  That is why he

41

has already started to—and will continue to—visit law and business school classes to help them avoid similar mistakes. The impact is already being felt. As one student put it "I truly appreciated his honesty … Being able to reflect and offer advice in the midst of his current situation is quite admirable and I learned a lot about growing from mistakes." *Ex. 7 (Vicki and Joel Blumenfeld Ltr.*) at 8; *see also*, *Ex. 111 (Prof. de Fontenay email)* ("I have already heard from several students who stuck around after class about how much they got out of your talk and how grateful they were for the opportunity…").

### e. COVID-19 Pandemic Weighs Against Custodial Sentence

Finally, we respectfully submit that the ongoing COVID-19 pandemic provides another reason not to impose a sentence of imprisonment. Since the early days of the pandemic, the Bureau of Prisons has acknowledged that "the population density of [its facilities] creates a risk of infection and transmission for inmates and staff." *Ex. 113 (Federal Bureau of Prisons Action Plan, March 13, 2020).*[11] In state and federal prisons alike, COVID-19 has run rampant.[12] Despite wider availability of vaccines, the Bureau continues to face substantial challenges to protect the large prisoner and corrections staff community from the COVID-19 pandemic.[13]

---

[11] *See also* Stuart A. Kinner & Jesse T. Young et al., *Prisons and Custodial Settings Are Part of a Comprehensive Response to COVID-19*, 5 The Lancet e188, e188 (Mar. 17, 2020) ("Prisons are epicentres for infectious diseases because of the higher background prevalence of infection, the higher levels of risk factors for infection, the unavoidable close contact in often overcrowded, poorly ventilated, and unsanitary facilities, and the poor access to health-care services relative to that in community settings.").

[12] *See, e.g.*, Rich Kremer, *More than 8 Percent of State's Prison Populations Currently Infected with COVID-19*, Wisconsin Public Radio (Nov. 6, 2020), https://www.wpr.org/more-8-percent-states-prison-population-currently-infected-covid-19 (describing COVID outbreaks in Wisconsin state prison system); Tyler Haden, *Sisters Say Brother Sick with COVID-19 Was Released from Lompoc Prison to Die*, Santa Barbara Independent (Apr. 15, 2020), https://www.independent.com/2020/04/15/sisters-say-brother-sick-with-covid-19-was-released-from-lompoc-prison-to-die/ (describing COVID outbreak at United States Penitentiary Lompoc).

[13] Data released by the Bureau of Prisons ("BOP") in its April 5, 2021 update reveal that, of 139,857 inmates currently incarcerated in BOP-managed institutions and community-based facilities, 371 presently have confirmed positive test results. Throughout the duration of the pandemic, 46,853 federal inmates and 5,490 staff have contracted and subsequently recovered from COVID; 228 inmates and 4 staff have died. Frequently updated BOP COVID data are available at https://www.bop.gov/coronavirus/.

Courts have appropriately taken the COVID-19 pandemic into account in determining sentences for defendants. *See United States v. Campagna*, No. 16-CR-00078 (LGS), 2020 WL 1489829, at *3 (S.D.N.Y Mar. 27, 2020) (modifying 55-year-old prisoner's sentence from imprisonment to home confinement in light of the COVID-19 pandemic). The Bureau of Prisons has been encouraged to "prioritize the use of [BOP's] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic," considering a variety of factors including the individual's "crime of conviction, and assessment of the danger posed by the inmate to the community."[14] Under these extremely challenging and unprecedented circumstances, we respectfully submit that it would be unnecessary to burden the prison system with yet another inmate whose imprisonment is not necessary to serve the interests of justice or deterrence.

Moreover, we understand that during the pandemic, the Bureau of Prisons has implemented strict protocols that require all incoming and outgoing inmates to be quarantined in an isolation cell for a period of at least 14 days before being released into the general population or back into the community. *Ex. 114 (Board of Prisons Aug. 7, 2020 Quarantine Guidance)* at 3. As part of its quarantine process, the Bureau of Prisons has adopted isolation procedures akin to a punitive measure used in the prison setting—solitary confinement.[15] We understand that quarantined inmates are generally kept in isolation in a cell with virtually no human interaction, no visitors, phone calls home only if phone privileges can comply with the Bureau's sanitation

---

[14] *See* Dep't of Justice, Office of Att'y Gen., Memorandum from Attorney General William Barr to BOP Director Michael Carvajal (Mar. 26, 2020), https://www.justice.gov/file/1262731/download.

[15] *See* Dep't of Justice, Federal Bureau of Prisons, Inmate Discipline Program at 14-15 (2011) (describing "disciplinary segregation" as a punishment tool.). *See also* Walter Pavlo, *Bureau of Prisons Using Solitary Confinement as a Means to Curb Covid-19 Contagion,* Forbes (July 16, 2020), https://www.forbes.com/sites/walterpavlo/2020/07/16/bureau-of-prisons-using-solitary-confinement-as-a-means-to-curb-covid-19-contagion/?sh=6adb0c90193a (describing how measures traditionally used for discipline, such as "elimination of social visits, no phone or email use, and being locked in a cell for an extended period of time," "are now being used to 'protect' inmates from contagion of COVID-19.").

procedures, and restrictions on essentials, including meals and recreation.  *See generally Ex. 114 (Board of Prisons Aug. 7, 2020 Quarantine Guidance)*.  Such quarantine requirements would result in an unduly harsh sentence that would not be tied to or justified by the offense.

For the reasons set forth above, even in normal times, the sentencing factors would not necessitate a custodial sentence for Dan.  During these unprecedented pandemic times, such a sentence would be particularly unnecessary and impose undue burdens on the prison system, as well as being unfairly punitive.

## V.   Conclusion

Dan made serious mistakes—and committed a crime—on July 31, 2020.  His life will never be the same because of it.  But aside from those few moments on that day, Dan has been a loving family man, a reliable friend, an honest professional, a caring employer, and a generous member of his community.  He is a good man who made a mistake on one day.  Taking into account that (1) his offense involved no premeditation or planning; (2) it resulted in no economic harm to the unsecured creditors; (3) he promptly acknowledged his mistake and accepted responsibility; (4) he has taken substantial steps to correct for his mistakes, including withdrawing from the Committee, cooperating with the U.S. Trustee, subordinating his interests, settling in the bankruptcy, and closing his fund; (5) breaches of fiduciary duty in bankruptcy almost never result in criminal charges and, if they do, result in a non-custodial sentence; (6) he has already suffered severe personal and professional consequences; (7) he has volunteered and already performed over 200 hours of community service, including teaching lessons to law and business students; and (8) general and specific deterrence have largely been served already, we respectfully submit that a non-custodial sentence of a term of probation and community service satisfies the sentencing objectives set forth in 18 U.S.C. § 3553(a).

Dated: April 23, 2021
New York, New York

Respectfully submitted,

Joon H. Kim
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006
jkim@cgsh.com
212-225-2000


Lawrence Gerschwer
BARNES & THORNBURG LLP
445 Park Avenue
Suite 700
New York, New York 10022
lawrence.gerschwer@btlaw.com
(646) 746-2022

*Attorneys for Daniel B. Kamensky*