UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                                   :

UNITED STATES OF AMERICA      :

                                               :      21 Cr. 67 (DLC)

        -  v.  -                     :

DANIEL KAMENSKY,             :

                Defendant.   :

-------------------------------------------------------x


# THE GOVERNMENT'S SENTENCING SUBMISSION


                                                    AUDREY STRAUSS
                                                    United States Attorney for the
                                                    Southern District of New York
                                                    One St. Andrew's Plaza
                                                    New York, New York 10007


Richard Cooper
Daniel Tracer
Assistant United States Attorneys
     *- Of Counsel -*

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum in advance of the sentencing of Daniel Kamensky ("Kamensky" or the "defendant"), scheduled for May 7, 2021, and in response to the sentencing submission of the defendant (Dkt. No. 27) ("Def. Br.").

Kamensky is a sophisticated bankruptcy attorney with decades of experience in law and finance who used his skills to corrupt the bankruptcy process. He well understood the importance of ensuring that the unsecured creditors of the bankruptcy estate of Neiman Marcus Group Ltd LLC ("Neiman Marcus") were able to maximize their recovery in the bankruptcy process; indeed, he served as co-chair of a committee tasked with that recovery. Nonetheless, he used his position as co-chair of that committee, and the threat of withholding future business from his hedge fund Marble Ridge Capital LP ("Marble Ridge"), to pressure another financial institution to abandon its bid for certain assets in the bankruptcy so that Marble Ridge could obtain those assets for a cheaper price. When his conduct came to light, his initial reactions were to deny misconduct and attempt to induce a key witness to lie. Only after being confronted with irrefutable evidence, including a recorded call of his attempt to obstruct justice, did Kamensky accept responsibility.

In order to reflect the seriousness of the offense, promote respect for the law, and ensure general deterrence, the Court should impose a term of imprisonment within the applicable United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range of 12 to 18 months. Such a sentence would be sufficient but not greater than necessary to serve the legitimate ends of sentencing.

**BACKGROUND**

The defendant, at the time of the offense conduct, was the principal of Marble Ridge, a hedge fund that invested in securities in distressed situations including bankruptcy. (*See* Presentence Investigation Report ("PSR"), Dkt. No. 28, ¶ 8). Prior to founding Marble Ridge,

1

Kamensky worked as a bankruptcy attorney at a prominent international law firm and as a distressed debt investor at prominent financial institutions. (*Id.*). The defendant's conviction relates to his activity during the bankruptcy proceeding in the United States Bankruptcy Court for the Southern District of Texas of the Neiman Marcus Group, an American chain of luxury department stores. Prior to its bankruptcy filing in May 2020, Neiman Marcus had transferred its interest in MyTheresa, an online luxury fashion retailer, to another entity that did not file for bankruptcy. (PSR ¶ 12). Some of Neiman Marcus's creditors, including Marble Ridge, alleged that transfer to be a fraudulent conveyance, and Marble Ridge played an active role in filing a number of lawsuits in pursuit of fraudulent conveyance claims. (*Id*.).

At the outset of the bankruptcy process, the Office of the United States Trustee (a component within the U.S. Department of Justice that, among other things, appoints representatives of a debtor's unsecured creditors to a creditor's committee), formed an Official Committee of Unsecured Creditors (the "Committee"). (PSR ¶¶ 11, 13). Marble Ridge, through the defendant, applied to be on the committee, and Kamensky agreed that he would serve as a fiduciary representing all unsecured creditors as a group. (PSR ¶ 13).

During the course of the Neiman Marcus bankruptcy, the Committee negotiated with the owners of Neiman Marcus to obtain shares of MyTheresa in exchange for providing a release from potential fraudulent conveyance claims. (PSR ¶ 14). Ultimately, the Committee and the Neiman Marcus owners agreed on a settlement wherein the owners would provide certain unsecured creditors of the bankruptcy estate with 140 million shares of MyTheresa securities, and the Committee intended for the settlement to be included in the final bankruptcy plan. (*Id*.). The bankruptcy court had set a deadline of August 3, 2020 for the submission of a disclosure statement setting forth the structure of the settlement. (*Id*.).

As the deadline approached, the Committee also discussed the possibility of entertaining an offer from Marble Ridge to purchase MyTheresa securities from unsecured creditors in what became known as a "cash-out option." Under the terms of the cash-out option, Marble Ridge would offer to purchase the MyTheresa securities from any unsecured creditor who preferred to receive cash instead of the illiquid MyTheresa securities. (*Id.*). On July 29, 2020, the Committee voted to support the settlement and agreed to continue negotiations with Marble Ridge, and Marble Ridge was recused from further Committee discussions about the cash-out proposal. (PSR ¶ 15). Kamensky proposed to the Committee that Marble Ridge provide the cash-out option by purchasing up to 60 million MyTheresa shares, for 20 cents per share, from any unsecured creditor who wished to sell the securities it obtained under the settlement. (PSR ¶ 18).

On July 30, 2020, Jefferies Financial Group, Inc. ("Jefferies") was contacted by a client who was interested in offering to the Committee to provide a cash-out option, and the following morning on July 31, 2020, two Jefferies employees ("Employee-1" and "Employee-2," and collectively, the "Employees") told the financial and legal advisors to the Committee that Jefferies was prepared to offer a cash-out option for a price "in the thirties" (*i.e.*, between thirty and forty cents per share), a price that was higher than Marble Ridge's 20-cents-per-share offer. (PSR ¶ 19). The Committee's advisors then called the defendant and informed him about Jefferies' bid, which prompted him to send an instant message to Employee-1, pressing him not to submit a bid for the MyTheresa securities by writing "tell [Employee-2] to stand DOWN," ". . . let's talk" and "DO NOT SEND IN A BID." (PSR ¶¶ 20-22).

Shortly after that, the defendant spoke on the phone with the Employees. In that call, he told them to stand down and not put in a bid for the MyTheresa securities. (PSR ¶ 23). Among other things, he told them that he had incurred $3.5 million in legal fees to get the MyTheresa securities as part of the settlement for the unsecured creditors, and that he believed that Marble

3

Ridge should be the one to provide the cash-out option. (*Id*.). The defendant threatened the Employees in order to get them to stand down by stating that Marble Ridge had been a good partner to Jefferies but if Jefferies moved forward with its bid, Marble Ridge would cease doing business with Jefferies. (*Id*.). The defendant also threatened to use his official role as co-chair of the Committee to ensure that any offer from Jefferies to provide the cash-out option would be rejected. (*Id*.). As a result of Kamensky's pressure, the Employees told the Committee's legal advisor that they were withdrawing from making a bid, and that Kamensky had requested that they withdraw their bid. (PSR ¶ 25).

The Committee's advisors then spoke with Marble Ridge's counsel and informed him of the substance of the call from the Employees. After speaking with Kamensky, Marble Ridge's counsel contacted the advisors and passed on the false story from Kamensky that he had *not* asked the Employees not to bid, but instead had told them to place a bid only if Jefferies was serious. (PSR ¶ 25).

That evening, Kamensky attempted to cover his tracks and influence what Employee-1 would tell others, including the Committee and law enforcement, about Kamensky's efforts to pressure Jefferies to abandon its bid. (PSR ¶ 26). Kamensky spoke with Employee-1 on the phone, and initiated the call by saying, "this conversation never happened." (*Id*.). In the ensuing conversation, which Employee-1 recorded because he was concerned that Kamensky would engage in unethical or illegal behavior, among other things, Kamensky asked Employee-1 why he had told others that Kamensky threatened to pull his business from Jefferies and asked if Employee-1 knew that it could result in Kamensky going to jail. (*Id*.) Kamensky also asked Employee-1 to falsely say that the earlier call was just a misunderstanding, and Kamensky had in fact only suggested that Jefferies should bid only if it was serious. (*Id*.). Specifically, on that call Kamensky said the following:

KAMENSKY: Why would you tell committee counsel that I threatened you? Why would you tell them that?

\* \* \*

KAMENSKY: Do you understand . . . I can go to jail? I can go to jail. Do you understand that?

\* \* \*

KAMENSKY: Okay. Well . . . I might go to jail. Okay? If you had told me that . . . . The position I'm going to take is this is a huge misunderstanding and I hope you – I pray you tell them that it was a huge misunderstanding, okay, and I'm going to invite you to bid and be part of the process . . . . But I'm telling you . . . this is going to the U.S. Attorney's Office. This is going to go to the court. Like, do you want to be dragged into this? Like, bid all you want but don't – don't – don't put me in jail.

\* \* \*

KAMENSKY: . . . Like, this is like, like, the committee counsel is going to report this. I can't stop that, okay? There's no question in my mind that they're going to report it. The only thing that I can say to them is that this is a huge misunderstanding.

\* \* \*

KAMENSKY: . . . [I]f you're going to continue to tell them what you just told me, I'm going to jail, okay? Because they're going to say that I abused my position as a fiduciary, which I probably did, right? Maybe I should go to jail. But I'm asking you not to put me in jail.

The following day, on August 1, 2020, Marble Ridge's counsel emailed the Committee, repeated Kamensky's previous false explanation that there had been a "misunderstanding" between Kamensky and Jefferies, and asked the Committee to assure Jefferies that it was encouraged to submit a bit for the MyTheresa securities. (PSR ¶ 30).

Counsel to the Committee subsequently informed the Office of the United States Trustee of Kamensky's actions, and the bankruptcy judge ordered that the Trustee conduct an investigation. As part of that investigation, Kamensky sat for a voluntary interview under oath,

5

where he was represented by counsel. (PSR ¶ 28). During that interview, Kamensky apologized for his conduct, said that he "may have" told the employees that their bid for MyTheresa securities would affect their business relationship with Marble Ridge and that he would use his membership on the Committee to prevent Jefferies' bid from being accepted by the Committee, but he also stated that he did not want Employee-1 to lie but instead was attempting to "manage the message" in the phone call described above. (PSR ¶ 29). The United States Trustee issued a report to the Bankruptcy Court following its investigation, concluding that "the substantial evidence collected to date clearly demonstrates that Mr. Kamensky breached his fiduciary duty to unsecured creditors"; that "this type of coercion by a Committee fiduciary is highly inappropriate"; and that Kamensky's "actions were a clear abuse of his Committee position and a breach of his duty."

Marble Ridge subsequently announced that it would wind down its operations and return investor capital. (PSR ¶ 30).

## PROCEDURAL HISTORY

On September 3, 2020, the defendant was arrested and charged with fraud in the offer or sale of securities, wire fraud, extortion and bribery in connection with bankruptcy, and obstruction of justice. On February 2, 2021, the defendant waived indictment and pled guilty before Your Honor to a one-count Information charging him with extortion and bribery in connection with bankruptcy, in violation of Title 18, United States Code, Section 152(6).

The Government agrees with the U.S. Probation Office on the Guidelines calculation in this case, which is also consistent with the stipulated Guidelines range in the plea agreement between the parties. In particular, the offense level is 13 calculated as follows: a base offense level of 14 pursuant to U.S.S.G. § 2J1.3(a), a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1, and a three-point reduction for the defendant's acceptance of responsibility pursuant to U.S.S.G. §§ 3E1.1(a) and (b). (PSR ¶¶ 39-48). The defendant has no

6

known criminal history. Accordingly, the recommended Guidelines range is 12-18 months of imprisonment. (PSR ¶ 107). Through its supplement to the PSR, the Probation Office has recommended a non-custodial sentence. (PSR at 28).

## **DISCUSSION**

The Government recommends that the Court impose a term of imprisonment within the stipulated Guidelines range of 12-18 months. Such a sentence is necessary to meet the statutory ends of sentencing, including just punishment, general deterrence, and promoting respect for the law. The defendant's requested non-custodial sentence would send the wrong message about the seriousness of the defendant's conduct and would be contrary to the sentencing goals of 18 U.S.C. § 3553(a).

*Applicable Law*

Once the Court has calculated the applicable sentencing guidelines, it must consider an appropriate sentence under the totality of factors set forth under Title 18, United States Code, Section 3553(a). While the Court must calculate the Guidelines, it is "emphatically clear that the Guidelines are guidelines--that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *Id.* at 188. "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *Id.* 189; *United States v. Genao*, 869 F.3d 136, 141 (2d Cir. 2017) ("The sentencing court must make an individualized assessment based on the facts presented.").

*The Seriousness of the Offense*

The crime that the defendant committed was very serious. The United States Trustee for Region 2, the federal agency that supervises the bankruptcy process that Kamensky attempted to corrupt, has submitted a victim impact statement which is attached hereto as Exhibit A (the "Trustee Letter") that addresses the seriousness of the offense and the need for commensurate punishment. As set forth in the Trustee Letter, official committees in bankruptcy proceedings serve "a unique purpose in protecting the integrity of the bankruptcy system by providing supervision, to a limited degree, of the conduct of the case by the debtor." (Trustee Letter at 3-4). An official committee of unsecured creditors—like the Committee in this case—relies on "[g]ood faith, trust and candor . . . to ensure that the work of the committee does not come to a standstill and is completed for the benefit of all unsecured creditors," and committee members "who serve their individual interests in a manner that is detrimental to other unsecured creditors not only violate their established fiduciary duty to their constituents—unsecured creditors—but also frustrate the committee's purpose." (Trustee Letter at 4).

The defendant's conduct strikes at the heart of these concerns. In order to ensure the fairness of bankruptcy cases—especially large, complex ones like the Neiman Marcus bankruptcy—auctions of property "must be and must be seen as transparent and fair to the seller, the buyer, bidders, and creditors." (*Id.*). While the defendant emphasizes that his conduct did not cause economic harm to unsecured creditors, (Def. Br at 1, 22, 29), the United States Trustee points out that the debtor and its stakeholders "were severely damaged by Kamensky's illegal conduct," and that "[a]lthough ultimately—and with no assistance from Kamensky—a cash-out option was offered to creditors, the misconduct by a Committee member with respect to a court-supervised bidding process put a significant taint upon the proceedings, and if not for this prosecution, could lend support for the proposition that the bankruptcy bidding process was

8

'rigged.'" (Trustee Letter at 4). Moreover, the defendant's conduct "resulted in the expenditure of significant judicial resources and costs to the Debtor, the Committee, and other parties" through time and money spent "to investigate and then respond to Kamensky's illegal actions that threatened the successful global resolution of the Debtor's bankruptcy case and the repayment of creditors" (Trustee Letter at 5). As the United States Trustee stated, "[t]he harm that resulted from Kamensky's abuse of the bankruptcy system cannot be overstated" and "[t]he nature of Kamensky's actions struck the very core of our bankruptcy system, such that this Court should impose a sentence adequate to protect the integrity of the bankruptcy system from similar abuses in the future." (*Id*. at 4-5).

The defendant offers various other arguments that seek to minimize the seriousness of the conduct. He suggests, for example, that (a) Marble Ridge should have been removed from the Committee once it began negotiating to provide the cash-out option; and (b) the defendant never would have engaged in this conduct if the Committee's legal counsel had honored Jefferies' request not to tell any other party that Jefferies was in discussions to provide the cash-out option. (Def. Br. at 28). These attempts to shift blame should be rejected—when presented with a competitive bid, and concerned about finishing negotiations for the cash-out option before the approaching deadline, the defendant did not hesitate to use the official leverage he had to stifle his competition. Given his sophistication and experience, the defendant well understood the nature of the proceeding and his obligations; it is not a mitigating factor that others did not take steps to insulate him from criminal activity.

Moreover, while the defendant quickly accepted responsibility after his conduct came to light, and should be credited for his acceptance of responsibility, it is also notable that when he was first alerted that his threats to Jefferies had been disclosed to the Committee's advisors, his first instinct was to lie (through his counsel), and then attempt to cover up his crime by placing a

9

blatantly obstructive call and asking a witness to lie.  Indeed, Kamensky's attempt to persuade Employee-1 was so flagrant that Employee-1 immediately began recording the call to create a record of the defendant's conduct.  Though the crime occurred on one day, it ranged from extorting competitors to obstructing justice, with the latter conduct evidencing the defendant's planned attempt to corrupt and belief that he was above the law.  Any sentence should reflect the seriousness of these crimes.

> *General Deterrence*

A term of imprisonment is also warranted to promote the goal of general deterrence.  The defendant contends that general deterrence has already been met and the "message already has been sent loud and clear" as a result of the publicity attracted by this case and the defendant's closure of Marble Ridge and other financial penalties.  (Def. Br. at 39).  To accept Kamensky's argument would be to accept that custodial sentences are not warranted for white-collar defendants who experience reputational and financial harm from committing a crime.

However, in this case there is substantial deterrent effect that can only be achieved through a custodial sentence.  The United States Trustee, in his victim impact statement, notes the importance of general deterrence in this case:  the sentence should be "adequate to protect the integrity of the bankruptcy system from similar abuses in the future."  (Trustee Letter at 5).  It is the custodial element of punishment that is necessary to effectively prevent people from engaging in certain types of white-collar crime in the first place.  *Cf. United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("[I]t is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his company by the threat of a purely probationary sentence.").

The defendant notes that very few criminal prosecutions are brought for violation of 18 U.S.C. § 152(6), the charge of conviction in this case.  (Def. Br. at 35-37).  However, that

10

argument underscores the need for a custodial sentence. Every day, new bankruptcy cases are filed and new creditors' committees are being formed. With so few prosecutions brought for violating this statute, a custodial sentence in *this* case will send the message to those who participate in the bankruptcy process that they must play by the rules and ensure the fairness of the proceedings for all stakeholders. Moreover, part of the reason that so few bankruptcy prosecutions are brought is due to the difficulty in detecting and proving underlying violations. Accordingly, where, as here, extortive conduct is uncovered and proven, the punishment must be sufficient to deter other potential wrongdoers from engaging in such conduct.

*COVID-19*

The defendant also argues that the ongoing COVID-19 pandemic provides a reason to impose a non-custodial sentence. (Def. Br. at 42-44). However, with the widespread availability of vaccinations, and with the current success of the Bureau of Prisons ("BOP") at managing COVID-19 within its facilities, the pandemic does not provide a basis for the Court to impose a sentence that does not otherwise meet the statutory goals of sentencing. Indeed, the defendant's brief includes a statistic that demonstrates that the BOP has sharply curtailed the risk to inmates: as of April 5, 2021, approximately 371 out of 139,857 BOP inmates (0.27%) had confirmed positive test results for COVID-19. (Def. Br. at 42 n.13). As of the date of this filing, April 30, 2021, the BOP's website indicates that approximately 194 out of 141,060 BOP inmates (0.14%) had confirmed positive test results for COVID-19. *See* https://www.bop.gov/coronavirus/ (last visited April 30, 2021). By the time the defendant would surrender for a custodial sentence, that number will likely be even lower. Accordingly, the Government respectfully submits that COVID-19 is not a reason for the Court to impose a non-custodial sentence.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the Court should sentence the defendant to a term of imprisonment within the applicable Guidelines range of 12 to 18 months.

Dated: New York, New York
April 30, 2021

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____/s/_____
Richard Cooper/Daniel Tracer
Assistant United States Attorneys
Tel. (212) 637-1027/2329